Robert H. **MICHEL**, et al., **Plaintiffs,**

v.

Donnald K. **ANDERSON,**
et al., **Defendants.**

Civ. A. No. 93–0039 (HHG).

United States District Court,
District of Columbia.

March 8, 1993.

David D. Aufhauser, Lon E. Musslewhite, Dennis M. Black, Hollis M. Greenlaw, Williams & Connolly, Washington, DC, for plaintiffs.

· Steven R. Ross, Gen. Counsel, Charles Tiefer, Deputy Gen. Counsel, Office of General Counsel, Washington, DC, for defendants.

## OPINION

·HAROLD H. GREENE, District Judge.

### I

### Background

In this case, thirteen Republican Members of the House of Representatives,[1] led by Minority Leader Robert Michel (R–Ill.),[2] seek to enjoin enforcement[3] of House Rule XII which was amended on January 5, 1993 to authorize Delegates from the District of Columbia, Guam, American Samoa, and the Virgin Islands, as well as the Resident Commissioner from Puerto Rico to vote in the House's Committee of the Whole. The Committee of the Whole is comprised of all Members of the House, and it is where a substantial portion of the chamber's business is conducted. The House also amended House Rule XXIII to require a *de novo* vote on the House floor on any question decided by the Committee of the Whole where the vote of the Delegates[4] was decisive. The Delegates

---

1. The following Members of the House of Representatives are plaintiffs in this suit in their capacity as Members of Congress and as voters: Robert Michel (R–Ill.), Newt Gingrich (R–Ga.), Gerald Solomon (R–NY), Don Young (R–Alaska), Craig Thomas (R–Wy.), Christopher Cox (R–Cal.), Henry Hyde (R–Ill.), Michael Castle (R–Del.), Jay Kim (R–Cal.), Deborah Pryce (R–Ohio), Henry Bonilla (R–Tex.), Thomas Bliley (R–Va.), and Edward Royce (R–Cal.). Additionally, three individual voters from some of the congressional districts represented by the plaintiff Members are also participating as plaintiffs. ·ˑ

2. Twenty-eight additional Members have joined these plaintiffs by means of an *amicus curiae* brief. *See* note 6, *infra*. ·

3. Plaintiffs have also asked for a declaratory ruling that non-Member voting in the Committee of the Whole is unlawful. ·

4. Throughout this Opinion, the Court's references to "Delegates" includes the Resident Commissioner from Puerto Rico. There is no practical distinction between the rights, privileges and entitlements of the Delegates and the Resident Commissioner. *See* II *Deschler's Precedents of*

are prohibited from participating in this second vote.

The plaintiffs moved for a preliminary injunction on the ground that these rules unconstitutionally vest the Delegates with legislative power, and that they dilute the legislative power of Members of the House. Alternatively, the plaintiffs claim that, by unilaterally modifying the Delegates' role, the House has violated the constitutional requirements of bicameralism and presentment of legislation to the President.

The defendants, who are the Clerk of the House and the five House Delegates,[5] argue that the Court should refrain from deciding this case under various jurisdictional and prudential doctrines. Further, the defendants contend that, if the merits were to be reached, the Court should hold that the rule change does not vest the Delegates with legislative power and that the rule is not otherwise constitutionally defective.[6]

Both parties have joined in requesting that the Court consolidate the plaintiffs' application for a preliminary injunction with final consideration of this issue on the merits pursuant to Federal Rules of Civil Procedure 65(a)(2). The Court grants this request, and

the decision herein constitutes a final judgment.

After discussing the history of the Committee of the Whole, the role it plays in the operations of the House, and the history of the position of territorial Delegate, the Court addresses the threshold issue of whether a judicial remedy with respect to this largely internal congressional dispute is appropriate. The Court then considers whether the changes in the House rules, as currently configured, run afoul of the Constitution.

## II

### Committee of the Whole

In order to appreciate the constitutional issues implicated in this lawsuit and to evaluate the defenses raised, it is necessary to review the origins of the Committee of the Whole, the function it serves in the legislative process, and the traditional role of Delegates in the House of Representatives.

The Committee of the Whole is comprised of all of the Members of the House of Representatives [7], and it convenes on the floor of the House with Members serving as the

---

*the House of Representatives* (1978) ch. 7, § 3, at 38. The historic origins of these two different titles relate to whether a territory was prepared to apply for statehood, in which case their representative in Congress was called a Delegate. *Id.* at 37. Additionally, where the Court uses the term "territorial Delegate" it includes the Delegate from the District of Columbia.

5. Donnald K. Anderson, the Clerk of the House of Representatives, is responsible for tallying and reporting the votes of the Committee of the Whole. The five other defendants are the Delegates who were given a vote in the Committee of the Whole through this rule change: Eleanor Holmes Norton (District of Columbia), Carlos Romero–Barcelo (Resident Commissioner from Puerto Rico), Robert Underwood (Guam), Ron De Lugo (Virgin Islands), and Eni Faleomavaega (American Samoa).

6. A number of parties have filed *amicus curiae* briefs on this novel constitutional issue. Twenty-eight other Republican Members of the House of Representatives have filed a brief in support of the request for preliminary injunction. Other briefs advocating the unconstitutionality of the rule changes have been filed by Citizens United, the Conservative Caucus, Inc., and the Abraham

Lincoln Foundation for Public Policy Research, Inc.

An *amicus curiae* brief supporting the constitutionality of the House rules was filed by a broad spectrum of organizations located in the District of Columbia, including the Federation of Civic Organizations, the League of Women Voters, the AFL–CIO, several bar associations, and fourteen past presidents of the D.C. Bar.

7. There are, in fact, two types of Committees of the Whole. The Committee of the Whole House on the state of the Union considers all public bills affecting taxes and spending. That is the Committee of the Whole at issue in this litigation. The second Committee of the Whole considers private bills relating to claims against the government, special immigration cases, and other private relief bills. The changes in the House Rules challenged here gave the Delegates the vote in the Committee of the Whole House on the state of the Union. *See* House Rule XII and 139 Cong.Rec. at H28 ("Wolfensberger Memorandum") (January 5, 1993).

The Wolfensberger Memorandum which was incorporated into the January 5, 1993 Congressional Record, is entitled "Committees of the Whole: Their Evolution and Functions." It was prepared by Don Wolfensberger, Minority Chief of Staff of the House Rules Committee.

chair on a rotating basis. It is in this procedural forum that the House considers, debates, and votes on amendments to most of the legislation reported out of the standing or select committees. Only after consideration of amendments in the Committee of the Whole is legislation reported to the floor of the House for final, usually perfunctory, consideration.

## A. History in England

The Committee of the Whole has its origins in seventeenth century England during the reign of King James I where it was referred to as the grand committee. Demonstrating that neither "gridlock" nor disputes regarding taxes are contemporary phenomena, the concept of convening the legislature in a Committee of the Whole developed in response to antagonism, and sometimes deadlock, between Parliament and the monarchy, particularly on the issue of taxation.

As the King and the legislature clashed over that issue, members of Parliament feared that the King's spies in the House of Commons, including the Speaker, would report "disloyal" votes to the crown. Such acts of betrayal could result in incarceration in jail or other sanctions against the particular member. *See* 139 Cong.Rec. at H27–28 (Wolfensberger Memorandum) (January 5, 1993).

In order to avoid the perils of recorded voting, members of Parliament met in informal sessions, on a clandestine basis, to debate legislation. The proceedings of these sessions were not recorded, and the King could not learn who had proposed amendments which exhibited disloyalty to or defiance of the monarchy. The Committee reported only its ultimate recommendation to the official House of Commons for confirmation or rejection. Through such a process the members of Parliament could avoid the iron hand of the monarchy. *Id.*

Other historians have noted that the Committee of the Whole was also used to circumvent the power of the standing committees which were often coopted by special interests or agents of the Crown. *See* Kenneth Bradshaw and David Pring, *Parliament and Congress,* at 209 (1981).

## B. Early American Practice

The members of the colonial legislatures, no more trusting of the monarchy than their British ancestors, continued the practice of convening in informal Committees of the Whole to shield their deliberations and actions from the agents of King George III. *See* IV Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States* 986–87 (1907).

The same practice also continued in the Continental Congress, the Congress of the Confederation, and the Federal Convention in Philadelphia where the Framers convened to draft the Constitution. 139 Cong.Rec. at H28 (Wolfensberger Memorandum) (January 5, 1993). In fact, one of the first decisions made by the Framers was to resolve "into a Committee of the Whole House to consider of the state of the American Union." *Hinds', supra,* at 987. It was in this Committee of the Whole that the Constitution was debated and approved. 1 *Records of the Federal Convention of 1787,* 29–322 (M. Farrand rev. ed. 1966).

With little fanfare or debate, the First Congress, comprised of many individuals from the Federal Convention and earlier American legislatures made provisions for the Committee of the Whole. In one of the first meetings of the United States House of Representatives on April 7, 1789, one of the first four fundamental rules initially adopted prescribed procedures for the conduct of Committees of the Whole. George Galloway, *History of the United States House of Representatives* 10 (1965). It was in this forum that bills were to be "twice read, twice debated by clauses, and subjected to amendment.... Conspicuous reliance was placed by the House, then as now, on the Committee of the Whole." *Id.*

Similarly, the first important pieces of legislation passed by the early Congresses were debated and significantly modified in the Committee of the Whole. For example, James Madison's bill calling for the establishment of executive departments passed through the Committee of the Whole which excised the President's removal power. *See*

*Myers v. United States,* 272 U.S. 52, 112–114, 47 S.Ct. 21, 23–24, 71 L.Ed. 160 (1926), (*citing,* 1 Annals of Cong. 585 (1789)). The Bill of Rights was likewise debated in the Committee of the Whole before it was referred to the full House for ultimate passage. *See Lee v. Weisman,* —— U.S. ——, —— – ——, 112 S.Ct. 2649, 2668–69, 120 L.Ed.2d 467 (1992) (Souter, J., concurring) (*citing,* 1 Annals of Cong. 731 (1789)).

Over the years the House has deployed, at times, more than one Committee of the Whole to perform additional functions in the legislative process. *See IV Hinds', supra,* at 987–89, and *see* note 7, *supra.* In any event, by the late 1800s the central role of the Committee of the Whole on the state of the Union was firmly established in the operations of the House. Beginning in that era and continuing until the present, all significant legislation, particularly revenue and expenditure bills, are referred to the Committee of the Whole for debate and the consideration of amendments prior to being reported to the House floor.[8] *See* 139 Cong Rec. at H30 (Wolfensberger Memorandum) (January 5, 1993), and Plaintiffs' Motion for Preliminary Injunction, Exh. 3 (Affidavit of Representative Robert Michel) (hereinafter "Michel Affidavit").[9]

### C. Current Functions

The critical function played by the Committee of the Whole is evident from House Rule XIII which provides that "all bills raising revenue, general appropriation bills, and bills of a public character directly or indirectly appropriating money or property" are to be referred to the calendar of the Committee of the Whole. *See also* House Rule XIII, cl.

3.[10] Even though the historic secrecy justifications for convening in the Committee of the Whole are, of course, no longer present, the Committee continues to be the focus of legislative activity in the House. The Committee of the Whole is still heavily relied upon because it is less subject to parliamentary delaying tactics than the House itself, such as motions to table bills, proposals to adjourn, motions to reconsider votes cast, and other such procedures. *See IV Hinds', supra,* at 993–95.

Moreover, in the Committee of the Whole a Member is limited to five minutes of debate per amendment as opposed to the one hour of debate time accorded each Representative on the floor of the House. *See* 139 Cong. Rec. at H30 (Wolfensberger Memorandum) (January 5, 1993). Lastly, the quorum requirement in the Committee is only 100 as compared to the constitutionally required quorum of 218 for the full House.[11] In short, it is simply more convenient and expedient for the House to continue to convene in the Committee of the Whole.

Under the House Rules in effect prior to the January 5, 1993, amendments that were rejected in the Committee of the Whole could not be considered again on the House floor. The only exception to this general restriction was the "rarely successful" procedure by which a defeated coalition could make one motion to recommit. *See* Michel Affidavit at 7. This procedure basically involves an initiation of the legislative process all over again by a reference of the pertinent bill back to a standing committee. *See* 139 Cong.Rec. at H30 (Wolfensberger Memorandum) (January

---

**8.** The two other House calendars were a calendar for public bills that did not touch on money matters, and a calendar for the "other" Committee of the Whole for private bills.

**9.** The defendants submitted no affidavits or other evidence.

**10.** House Rule XXIII, cl. 3, provides:

All motions or propositions involving a tax or charge upon the people, all proceedings touching appropriations of money, or bills making appropriations of money, or property, or requiring such appropriation to be made, or authorizing payments out of appropriations already made, or releasing any liability to the United States for money or property, or referring any claim to the Court of Claims, shall be first considered in a Committee of the Whole, and a point of order under this rule shall be good at any time before the consideration of a bill has commenced.

**11.** The Constitution states that "... a majority of each [House] shall constitute a Quorum to do Business;" U.S. Const. art. I, § 5, cl. 1. Now that the House has 435 full Members, a quorum, under this clause, is comprised of 218 Members.

5, 1993).[12]

After the Committee of the Whole completes its work on a piece of legislation it "rises," and the bill is sent to the floor of the House for final approval.[13] Once the bill is so reported to the floor, no other amendments may be offered on that legislation. In fact, once a bill arrives on the House floor from the Committee of the Whole, the House usually conducts a straight "up or down" vote on the legislation as a whole, see Michel Affidavit at 7, and the bill considered by the full House is the legislation as it was amended during the deliberations of the Committee of the Whole.

Upon a motion from the floor, each amendment to the bill approved by the Committee of the Whole can be subjected to a separate vote on the House floor. See Michel Affidavit at 7. However, as noted supra, an amendment that was defeated in the Committee of the Whole could not be resurrected in the House, at least not prior to the January 5, 1993 rules change. This was also true of amendments barred from consideration by rulings of the chair or effectively rejected through substitute or second degree amendments. Michel Affidavit at 5–6; Affidavit of Representative Gerald Solomon at 4–11.

As is evident, the most significant portion of the House of Representatives' business is done in the Committee of the Whole. The "work of the Committee of the Whole is seldom reversed or recommitted by the House for the simple reason that the work was done by the same House under a different name and using different procedures." See 139 Cong.Rec. at H30 (Wolfensberger Memorandum) (January 5, 1993); see also, Charles Tiefer, Congressional Practice and Procedure 340, 386 (1989) (the Committee of the Whole is the "dominant phase in the

chamber's consideration of a bill" and is "the heart of the chamber's operations").

## III

### Status of Delegates

Before discussing the manner in which the recent changes in the House rules affect the legislative process just described, it is useful to provide a brief history of the office of "Delegate" and a review of the present status of that position. As indicated, there are currently five non-voting participants in the House of Representatives, representing the District of Columbia, Puerto Rico, the Virgin Islands, Guam, and American Samoa.

Article I of the United States Constitution vests "[a]ll legislative Powers ... in a Congress of the United States." U.S. Const. art. I, § 1. Article I goes on to require that "[t]he House of Representatives shall be composed of Members chosen ... by the People of the several States...." U.S. Const. art. I, § 2, cl. 1.

Obviously the five Delegates do not represent "States" nor are they chosen by "People of the several States." These Delegates are also not subject to the age, citizenship, and residency qualifications for membership set forth in the Constitution for all Members of the House of Representatives.[14] For example, unlike Members of Congress who, by Article I of the constitution, are required to be American citizens, the Delegate from American Samoa is only required to "owe allegiance to the United States." See 48 U.S.C. § 1733 (1988).[15] Moreover, American Samoa, the Virgin Islands, Guam, and Puerto Rico are generally self-funded, retaining their own tax collections. See 26 U.S.C.

---

**12.** Contrary to the defendants' claim, the availability of this cumbersome procedure does not mean that amendments defeated in the Committee of the Whole can effectively be reviewed by the full House. Defeat of an amendment in the Committee of the Whole is realistically the final consideration of that issue by the House of Representatives.

**13.** A majority of the Committee of the Whole must approve a motion to rise.

**14.** The Constitution states that:

No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.

U.S. Const. art. I, § 2, cl. 2.

**15.** Under various statutes, the other Delegates must be American citizens.

§§ 876(a), 931, 932(c)(4), 933, and 7654 (1988).[16]

Beyond that, these five individuals represent areas and constituents with vastly different political, cultural, geographic, and economic ties to the rest of the United States. The populations of these areas range from 47,000 in American Samoa to 3.6 million in Puerto Rico. By comparison, the average population of the congressional districts represented by the thirteen Member plaintiffs here is approximately 569,864.[17]

Each of these five non-voting Delegate positions was created through a different statute. The common theme in all these statutes is that the particular Delegate is given a seat in Congress with the "right of debate, but not of voting." *See, e.g.,* 2 U.S.C. § 25a(a) (1988) (statute creating D.C. Delegate).[18]

The concept of permitting non-voting Delegates to serve in the House of Representatives is well-rooted in the history of the American Congress. The Constitution vests Congress with plenary power to regulate and manage the political representation of the territories.[19] A similar vesting of power is conferred on Congress to govern the District of Columbia.[20] The Supreme Court has consistently affirmed the broad authority of Congress to take action with respect to the territories and the District of Columbia pursuant to these clauses. *See Sere & Laralde v. Pitot,* 10 U.S. (6 Cranch) 332, 336–37, 3 L.Ed. 240 (1810) ("we find Congress possessing and exercising absolute and undisputed power of governing and legislating for the territories"); *Binns v. United States,* 194 U.S. 486, 491, 24 S.Ct. 816, 817, 48 L.Ed. 1087 (1904) ("Congress, in the government of the territories as well as the District of Columbia, has plenary power, save as controlled by the provisions of the Constitution"). On the specific question of Congress' power to prescribe the political rights of the territories, the Supreme Court has stated that "in ordaining government for the Territories, and the people who inhabit them, all the discretion which belongs to legislative power is vested in Congress." *Murphy v. Ramsey,* 114 U.S. 15, 44, 5 S.Ct. 747, 763, 29 L.Ed. 47 (1885).

Although the territorial and other Delegates have never before been granted authority to vote in the Committee of the Whole, they have, intermittently over the past two centuries and consistently over the past two decades, been given significant authority in standing and select committees of the House.

For example, the Northwest Ordinance of 1787 created the post of territorial Delegate who was given a "seat" in Congress with the right to debate, but not the right to vote. 1 Stat. 50, 52 (1789). The second Delegate from the Northwest Territories was a future President, William Henry Harrison. During his service as a Delegate in Congress, at a time when numerous Framers of the Constitution served in the national legislature, Harrison was allowed to chair an important public lands committee and play a significant role in the passage of legislation. *See* Doro-

---

**16.** Plaintiffs point to the anomaly of such Delegates passing upon taxation and appropriations for the United States as part of the Committee of the Whole.

**17.** Indeed, under *Wesberry v. Sanders,* 376 U.S. 1, 8–9, 84 S.Ct. 526, 530–31, 11 L.Ed.2d 481 (1964), the number of inhabitants in the various congressional districts of this nation must, "as nearly as practicable," contain an equal number of people.

**18.** Legislation authorizing the other Delegates to sit in the House similarly states that each is to be a "nonvoting delegate." *See* 48 U.S.C. § 1711 (1988) (Guam and the Virgin Islands), 48 U.S.C. § 1731 (1988) (American Samoa), and 48 U.S.C. § 891 (1988) (Puerto Rico).

The office of Resident Commissioner from Puerto Rico was established by Congress in 1900

(Act of Apr. 12, 1900, 31 Stat. 77, 86); in 1972 Congress authorized the election of a Delegate from Guam and from the Virgin Islands (48 U.S.C. § 1711 (1988)); in 1978 a Delegate was authorized for American Samoa (48 U.S.C. § 1731 (1988)); and the office of Delegate for the District of Columbia was established in 1970 (84 Stat. 848 (Sept. 22, 1970)).

**19.** The Constitution states with regard to the territories, "Congress shall have the power to make all needful rules and regulations respecting" these entities. U.S. Const. art. IV, § 3.

**20.** The Constitution states that "Congress shall have Power ... to exercise exclusive Legislation in all Cases whatsoever" over the District of Columbia. U.S. Const. art. I, § 8.

thy Burne Goebel, *William Henry Harrison* 44 (1926); 6 Annals of Congress, col. 209–10 (December 24, 1799); 6 Annals of Congress, col. 529 (February 19, 1800).[21] Other Delegates followed Harrison's example and served on various standing committees of the House. *See* II *Hinds', supra, Precedents of the House of Representatives of the United States* at 864–65.

The frequency of this practice in the early Congress was noted by an 1840 House Committee report which observed that:

> With the single exception of voting, the Delegate enjoys every other privilege and exercises every other right of a Representative. He can act as a member of a standing or special committee and vote on the business before said committees, and he may thus exercise an important influence on those initiatory proceedings by which business is prepared for the action of the House.

II *Hinds', supra,* at 865 (*quoting,* H.R.Rep. No. 10, 27th Cong., 1st Sess. 4–5 (1841)). *See also,* II *Deschler's Precedents of the United States House of Representatives* (1978) ch. 7, § 3, at 39 ("in early Congresses, Delegates and Resident Commissioners were entitled to vote in the committees to which they were assigned") (citations omitted).

The practice of allowing Delegates to vote in standing committees apparently continued until the middle of the nineteenth century at which time the Delegates relinquished this power in exchange for other concessions. *See* Cong. Globe 42nd Cong., 2d Sess. 117–118 (February 13, 1871).[22]

For the next century, until 1970, Delegates no longer possessed the right to vote in standing committees. That year, as part of the 1970 Legislative Reorganization Act,

Congress expanded the powers of the Resident Commissioner from Puerto Rico to include the right to vote in standing committees. And over the next three years, the House periodically amended its rules, so that by 1973 all Delegates had once again the power to vote in standing committees. There were no further modifications of the Delegates' powers until the changes that were made in January, 1993.

## IV

### *Rules Change*

The genesis of this lawsuit was a decision by the House of Representatives, on January 5, 1993, to amend House Rule XII to give the five non-voting Delegates in the House of Representatives a vote in the Committee of the Whole, as follows:

> In a Committee of the Whole House on the state of the Union, the Resident Commissioner to the United States from Puerto Rico and each Delegate to the House shall possess the same powers and privileges as Members of the House.

Rule XII(2) of the Rules of the House of Representatives.

This rule change, made pursuant to the House's broad constitutional power to adopt its internal rules,[23] was opposed by all the Republican Members of the House and by 23 Democrats. 139 Cong.Rec. at H53–54 (January 5, 1993).[24]

■ As discussed above, this rule change marks the first time in the history of the House of Representatives that territorial Delegates, or any other non-Members, were

---

21. Harrison was also appointed to serve on a House committee established to address the urgent problem of the political division of the territories. Goebel, *William Henry Harrison* at 49; 6 Annals of Congress, col. 198 (December 10, 1799).

22. According to the defendants, the Delegates were persuaded to give up their seats in exchange for "guaranteed memberships with substantial rights on the key committees of greatest importance to them—the Committee of the Dis-

trict of Columbia, and the Committee of the Territories." *See* Defendants' Motion to Dismiss at 22.

23. The Constitution provides that each chamber of Congress "may determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2.

24. Concern was expressed by the opponents that the Democrats in Congress were seeking by this means to increase their House majority by five, all five Delegates being Democrats.

given a vote in the Committee of the Whole.[25] The House also amended its rules to allow these Delegates to serve periodically as chair of the Committee of the Whole.[26]

As the House gave the Delegates these unprecedented powers, it also adopted a rule (Rule XXIII(2)(d)) that is generally described as a "savings clause" which, as elaborated on in Part VII, *infra,* calls for an automatic *de novo* vote in the House itself whenever the votes of the Delegates are decisive in the Committee of the Whole. As will be seen, the interplay between the House's decision by Rule XII to authorize Delegate voting in the Committee of the Whole and the "savings clause" in Rule XXIII is critical to the outcome of this lawsuit.

## V

### *Jurisdictional and Prudential Considerations*

The Court cannot reach the merits unless it is able first to cross several jurisdictional and prudential barriers: the doctrines of standing, textual commitment, and remedial discretion. Because in this case several Members of Congress request the Judiciary to invalidate the action of the House of Representatives, separation of powers concerns require the Court to tread cautiously and to weigh the impact of these doctrines at the outset.

### A. Standing

■ The Court turns first to the question of standing. Article III of the Constitution limits judicial action to "cases or controversies." U.S. Const. art. III, § 2. The doctrine of standing ensures that courts remain within the boundaries of their constitutional power by requiring that the plaintiffs have a personal stake in the outcome of the contro-

versy, at least by allegation. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

■ The four-part test to determine whether a party has standing [27] is well-established: (1) there must be an injury in fact; (2) to an interest arguably within the zone of interests protected by the constitutional guarantee at issue, here the U.S. Const. art. I, § 1 and § 2; (3) resulting from the putatively illegal conduct and; (4) which could be redressed by a favorable decision of the court. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

■ In the instant matter, the standing debate revolves primarily around the issue whether there is a judicially-cognizable injury. *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1168 (D.C.Cir.1983). Where separation of powers concerns are present, the Court will not lightly exercise its authority to decide litigation, and absent a compelling and specific injury, the Court must decline to involve itself in an action against a coordinate branch of government. Mere generalized or speculative injury cannot create standing in such actions.

■ For example, a claim that the alleged unconstitutional action merely diminishes a legislator's effectiveness, as perceived by that legislator, is too amorphous an injury to confer standing. *See Harrington v. Bush,* 553 F.2d 190, 205–206 (D.C.Cir.1977) (Representative did not have standing because claim that illegal activities of CIA diminished his effectiveness as legislator was not concrete injury). By contrast, the loss of a vote or deprivation of a particular opportunity to vote is a sufficiently particularized injury to warrant judicial involvement in congressional

---

**25.** The mere fact that this change in the House rules is unprecedented is not, in and of itself, sufficient grounds for striking it down. In considering an alteration of the means by which the House determined whether a quorum was present, the Supreme Court stated that "it is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time." *United States v. Ballin,* 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892).

**26.** House Rule XXIII(1)(a) now states that "In all cases, in forming a Committee of the Whole House, the Speaker shall leave his chair after appointing a Member, Resident Commissioner, or Delegate as Chairman to preside...."

**27.** For purposes of determining standing, the Court accepts plaintiffs' pleaded facts as valid. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

affairs. *Moore v. United States House of Representatives*, 733 F.2d 946, 952–53 (D.C.Cir.1984); *Coleman v. Miller*, 307 U.S. 433, 438, 59 S.Ct. 972, 975, 83 L.Ed. 1385 (1939); *Dellums v. Bush*, 752 F.Supp. 1141, 1147 (D.D.C.1990).

■ In the instant action, the required showing of particularized injury is clearly met. The Constitution guarantees the right to proportional representation in the House of Representatives.[28] Among the plaintiffs' claimed injuries is an abridgement of that right. Article I, section 2, provides in pertinent part: "Representatives ... shall be apportioned among the several States which may be included within this Union, according to their respective Numbers...." U.S. Const. art. I, § 2, cl. 3. The alleged dilution of that representational voting power set forth in the Constitution satisfies the requirement of injury in fact. Although the House majority's action does not entirely strip Members of that body of their right to vote, it is claimed to take from them precisely what the Constitution guarantees—votes carrying weight proportional to their States' population.

In *Vander Jagt, supra*, 699 F.2d at 1170, the Court of Appeals found sufficient injury when "the essence of the lawsuit is that the Democratic House leadership has successfully diluted the political power of Republican representation on congressional committees." Similarly, in holding unconstitutional an action by a State executive branch overriding the votes of state senators, the Supreme Court has stated that "these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes ... They have set up and claimed a right and privilege under the Constitution to have their votes given effect." *Coleman v. Miller, supra*, 307 U.S. at 438, 59 S.Ct. at 975. So, too, here. *See also, Montana v. United States Dep't of Commerce*, 775 F.Supp. 1358 (D.Mont.1991) (three-judge court), *rev'd on other grounds*, —— U.S. ——, 112 S.Ct. 1415, 118 L.Ed.2d 87 (1992).

The remaining requirements of standing are also satisfied. The alleged harm falls squarely within the zone of interests protected by Article I of the Constitution. The political system created by the Framers vests legislative power in the House of Representatives and the United States Senate. U.S. Const. art. I, § 1. Members of the House are chosen in proportion to the number of citizens in their respective States, and they are each given a vote as the tool with which to craft legislation. As the pool of possible votes expands, the effectiveness of each individual vote shrinks. The action of the House majority, if there is merit to the allegations—an issue discussed below—impairs the role of House Members in the constitutional scheme of lawmaking and thus directly impairs the effectiveness of each Representative's individual vote. *See Dellums v. Bush, supra*.

Turning to the third requirement, the Court is able to trace the injury to the House majority's challenged action. Plaintiffs need only make a reasonable showing that but for defendants' actions, the alleged injury would not have occurred. The plaintiffs here sufficiently established this connection.

Unlike other cases in which a variety of forces could possibly be responsible for a plaintiff's injury, here the nexus connecting act and injury is direct and clear. *See, e.g., Community Nutrition Inst. v. Block*, 698 F.2d 1239 (D.C.Cir.1983), *rev'd on other grounds*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). Absent the passage of House Rule XII, permitting the five Delegates to vote in the Committee of the Whole, the alleged dilution of the other Members' votes would not have occurred. Accordingly, the Court finds that the plaintiffs have alleged the requisite causal link.

Finally, the alleged injury is capable of redress by the Judiciary. Plaintiffs seek only a ruling that House Rule XII is unconstitutional. Passage of that House rule allegedly caused the injury complained of here, and a judicial decision finding that rule constitutionally infirm and enjoining the House from enforcing it would certainly cure any harm.

---

**28.** Each State is of course entitled to two Senators regardless of population.

Inasmuch as the plaintiffs meet the requirements of all four prongs under *Simon, supra,* the Court concludes that they have standing to proceed.

## B. Textual Commitment

■ A controversy is non-justiciable where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker v. Carr, supra,* 369 U.S. at 217, 82 S.Ct. at 710; *Nixon v. United States,* —— U.S. ——, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993). However, while the Constitution confers on the House the power "to determine the Rules of its Proceedings," art. I, § 5, cl. 2, the Judiciary, too, has a role to play. It rests with the courts to evaluate the validity of House rules in relation to the Constitution. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). As the Supreme Court has stated, "the Constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights." *United States v. Ballin,* 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892).

Thus, while the prudential concerns continue to have great vitality, "it is nonetheless critical that we do not deny our jurisdiction over the claims in the case. As it is conceivable that the committee system could be manipulated beyond reason, we should not abandon our constitutional obligation—our duty and not simply our province—'to say what the law is.' " *Vander Jagt, supra,* 699 F.2d at 1170 (*quoting Marbury v. Madison, supra* ).

■ Again, separation of powers concerns require caution in reviewing House rules, but it has never been held that this textual commitment renders disputes regarding such rules ipso facto nonjusticiable. *Vander Jagt, supra,* 699 F.2d at 1173. Thus, although a court may not order the House to

adopt any particular rule, "Article I does not alter our judicial responsibility to say what rules Congress may not adopt because of constitutional infirmity." *Id.* On this basis, while the subject of House rules is textually committed to the House, the courts are not thereby ousted of jurisdiction to consider the consistency of a particular rule with the Constitution.[29]

## C. Remedial Discretion

■ Separation of powers concerns are also incorporated into principled decision-making which holds that, in certain circumstances, a federal court may, in its discretion, grant or withhold injunctive or declaratory relief with respect to intramural disputes in Congress. Under this "remedial discretion" doctrine,[30] the Court will consider a number of factors in determining whether the dispute calls for judicial intervention or is best left to congressional resolution. Among these are the possibility of an alternate remedy through congressional action or a private suit, the egregiousness of the constitutional violation, and the extent of the intrusion of the Judiciary into legislative action if the court entertains the suit. *See, e.g., Humphrey, supra,* 848 F.2d at 214 n. 4; *Moore, supra,* 733 F.2d at 954–56; *Vander Jagt, supra,* 699 F.2d at 1174–75; *Riegle v. Federal Open Market Committee,* 656 F.2d 873, 881 (D.C.Cir.1981); *contra Melcher v. Federal Open Market Committee,* 836 F.2d 561, 564–65 (D.C.Cir.1987).

Defendants contend that, because plaintiffs' dispute and potential remedy is with their colleagues, the remedial discretion doctrine ipso facto compels the Court to dismiss the action. Under this interpretation of the doctrine, if there is any hope, however remote, that the House's new rule will be remedied by Congress, the Court must de-

---

**29.** This line of reasoning also disposes of the related political question doctrine of justiciability. *See United States Dep't of Commerce v. Montana,* —— U.S. ——, 112 S.Ct. 1415, 1425, 118 L.Ed.2d 87 (1992); *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

**30.** The doctrine of remedial discretion is recognized and applied in this Circuit. *Humphrey v. Baker,* 848 F.2d 211, 213 (D.C.Cir.1988); *Melcher v. Federal Open Market Committee,* 836 F.2d 561 (D.C.Cir.1987). It has not been addressed by the Supreme Court. *Humphrey, supra.*

cline to grant relief. That is clearly incorrect.[31]

The court's remedial discretion is not inflexibly applied, and in considering whether a remedy is appropriately given, the court weighs a variety of factors. Although the case law is equivocal, a suit in which there are also non-congressional, private plaintiffs may be able to resist dismissal. *Moore, supra,* 733 F.2d at 956; *Vander Jagt, supra,* 699 F.2d 1175 n. 24; *Riegle, supra,* 656 F.2d at 881; *contra Melcher,* 836 F.2d at 564–65. In those instances in which a suit was essentially an intramural dispute and could have been brought by private plaintiffs but was not, the Court dismissed the action. For example, in *Riegle, supra,* the court exercised its discretion in refusing to invalidate the allegedly unconstitutional Federal Reserve Act, 12 U.S.C. § 221 *et seq.* (1976), passed by a majority of Senator Riegle's colleagues, or to enjoin five members of the Federal Reserve Bank from voting pursuant to the Act. Several factors were cited in the opinion, but its principal basis was that, because there were private plaintiffs who had the ability to challenge the statute, judicial review could be obtained without creating separation of powers problems. 656 F.2d at 882; *contra Melcher, supra,* 836 F.2d at 564–545.[32] There the court indicated that had private plaintiffs been joined, the court "would be obliged to reach the merits of the claim." *Riegle,* 656 F.2d at 881.

In the instant case, the Republican House Members sued not only in their congressional capacity but also in their capacity as voters. Moreover, other, non-congressional private citizens have also joined in the suit as plaintiffs.[33] *See Gregg v. Barrett,* 771 F.2d 539, 546 (D.C.Cir.1985). The House's rules change, by allegedly granting legislative power to territorial Delegates, at least one of whom represents as few as one-tenth of the number of citizens represented by each Member of the House pursuant to constitutionally-required reapportionment (U.S. Const. art. I , § 2, cl. 3), dilutes the vote of these citizens. *See Franklin v. Massachusetts,* — U.S. —, —, 112 S.Ct. 2767, 2776, 120 L.Ed.2d 636 (1992) (O'Connor, J., plurality opinion); *Montana v. U.S. Dept. of Commerce, supra.* It follows that the private plaintiffs are legitimately in the suit, and their presence presents a more compelling claim for judicial involvement. *Moore, supra,* 733 F.2d at 956; *Vander Jagt, supra,* 699 F.2d 1175 n. 24; *Riegle, supra,* 656 F.2d at 881; *contra Melcher,* 836 F.2d at 564–65.

In *Moore,* too, the court relied on the possibilities of congressional repeal and citizen suit to dismiss a challenge to the constitutionality of a statute (Tax Equity and Fiscal Responsibility Act of 1982). 733 F.2d at 955–956. As in *Riegle, supra,* private plaintiff had standing to bring the suit but were not plaintiffs. *Id.*

Some of the pertinent cases were decided on other grounds in the general remedial discretion framework. In *Humphrey, supra,* while the court concluded that a legislative remedy was available to correct the plaintiffs' grievance, it nevertheless considered the merits, and found the law to be constitutional. 848 F.2d at 213. In *Vander Jagt,* for example, the Republican plaintiffs contended that the majority Democrats had provided them with fewer seats on House committees and subcommittees than they were proportionally owed. In rejecting the invitation to have the dispute decided by the courts, the Court of Appeals explained that the prospect of fashioning a remedy, while not impossible, was "a startling unattractive idea." 699 F.2d at 1176.[34] A remedy would have required

---

**31.** If defendants' argument were correct, there would be no discretion and indeed no doctrine of remedial discretion because in view of the nature of intramural congressional disputes, one could always hypothesize that a congressional remedy may exist. Certainly, for example, if a House majority decided to deprive blacks or Republicans of their votes, the courts would remedy the situation notwithstanding the theoretical possibility that the majority could, somehow, be persuaded to change its mind.

**32.** The court also did note that Senator Riegle could obtain substantial relief from the action of his fellow legislators by convincing them to enact, amend, or repeal the offending statute.

**33.** Gregory T. Chambers, Becky M. Costantino, and Lois Stetzler.

**34.** The Republican plaintiffs complained about underrepresentation on the Budget Committee, the Appropriations Committee, the Ways and Means Committee, and the Rules Committee. 699 F.2d at 1167.

the court to dictate to the Speaker "how many Democrats, and perhaps even which Democrats, he is to appoint to the standing committees." *Id.* Rather than to inject itself so deeply into the legislative process, the Court of Appeals declined to approve equitable and declaratory relief.

In the instant case, by contrast, the remedy would be uncomplicated and unintrusive. The Court is not called upon to devise rules for the operation of the House but only to pass on the legality of a rule already enacted. In the view of this Court, it is not precluded by prudential considerations from performing this single, relatively simple act, if it turned out, on the merits, that Rule XII and XXIII, taken together, improperly granted votes to the Delegates in violation of Article I of the Constitution and to the detriment of the Members from the several States. Once that matter is decided, judicial involvement will be at an end.

There is yet another reason for not abstaining in the exercise of the Court's discretion. The precedents (*e.g., Riegle* and *Moore* ) involved situations where, even without judicial intervention, the controversies would not have a long-lasting impact because they involved only a single statute. By contrast, the instant case revolves around the legislative process itself. Therefore, if House Rule XII is constitutionally infirm, and the courts do not resolve the matter, Delegates will improperly vote in the Committee of the Whole for the indefinite future, and a shadow of unconstitutionality will be cast on much future House action. The argument for judicial decisionmaking in the face of such potentially broad and long-lasting effects is compelling.

The Court concludes that it does not lack jurisdiction and that there is no prudential reason for judicial abstention. The defendants' request for a dismissal of the action on grounds short of the merits is therefore denied.

## VI

### Vesting of Legislative Power in Individuals Who are Not Members of Congress

█ Now as to the merits. The plaintiffs challenge the constitutionality of the changes in the House rules on two grounds. First, they argue that, by allowing them to vote in the Committee of the Whole, the House has unconstitutionally invested the territorial Delegates with legislative power. Second, they claim that the House of Representatives has violated the principles of bicameralism and presentment by unilaterally increasing the power of the Delegates. These contentions are discussed below in turn.

█ One principle is basic and beyond dispute. Since the Delegates do not represent States but only various territorial entities, they may not, consistently with the Constitution, exercise legislative power (in tandem with the United States Senate), for such power is constitutionally limited to "Members chosen ... by the People of the several States." U.S. Const. art. I, § 8, cl. 1.

It is not necessary here to consider an exhaustive list of the actions that might constitute the exercise of legislative power; what is clear is that the casting of votes on the floor of the House of Representatives does constitute such an exercise. Thus, unless the areas they represent were to be granted statehood, the Delegates could not, consistently with the Constitution, be given the authority to vote in the full House.

On the other hand, not all votes cast as part of the congressional process constitute exercises of legislative power. For example, as discussed in Part III, *supra,* representatives of the territorial entities have at various times in United States history been given the authority to sit on and vote in standing and select committees of the House of Representatives, and they exercise that authority now.[35]

---

**35.** There has been no litigation concerning this authority, and thus no judicial decision one way or the other on the authority of the Delegates to participate in standing and select committee deliberations and votes. However, the plaintiffs in this case have affirmatively stated that they are not here questioning that authority, although they note in passing that the practice "may well be constitutionally infirm." Plaintiffs' Memorandum of Points and Authorities in Support of Preliminary Injunction at 20 n. 4. One of the *amici* does assert that the Delegates should not

The question here, of course, is whether, consistently with the constitutional mandate that only representatives of States who meet the required qualifications may exercise legislative power, Delegates may cast votes in the Committee of the Whole. This body has broader responsibilities than the standing and select committees of the House, but it is obviously not the House of Representatives itself.

In the opinion of this Court, defendants' claims to the contrary notwithstanding, voting in the Committee of the Whole constitutes an exercise of legislative power. Today, the Committee of the Whole performs much the same functions that it did in the past. According to the uncontradicted evidence produced by Congressman Michel, one of the plaintiffs herein, the Committee of the Whole is a committee only in name. It is convened on the floor of the House and is chaired from the Speaker's rostrum. The bulk of the chamber's time is occupied by the molding of legislation through debate and amendment in the Committee of Whole. Indeed, the Committee of the Whole occupies a central role on taxes, appropriations, and all other matters touching upon money. Michel Affidavit at 3–6.

Beyond that, consideration of a bill in the Committee of the Whole normally represents the sole mechanism by which Representatives who are not Members of the proposing standing committee may help to shape legislation in the House. Solomon Affidavit at 5.

Amendments that are defeated or precluded from consideration as a result of parliamentary decisions in the Committee of the Whole may not be heard again by the House. Michel Affidavit at 6. Again, according to the Michel and Solomon affidavits, a bill, as amended by the Committee of the Whole, is

in most circumstances, passed by the full House: no further debate is permitted; no new amendments may be offered, and no previously rejected amendments may be reintroduced. *See* Michel Affidavit, at 7; and Solomon Affidavit, at 5–6.

It is true that in no instance does a vote in the Committee of the Whole end the House's consideration of a bill. A bill is officially passed by the House of Representatives on the floor of the House, and all the work of the Committee of the Whole must ultimately approved by the full House before it becomes official. However, for the reasons stated, House action is frequently formal and ceremonial rather than substantive. For practical purposes, most decisions are final insofar as the House of Representatives is concerned when they are made by the Committee of the Whole.

Indeed, formal legislative action and legislative power are not interchangeable terms. The Supreme Court has defined legislative power as action which has "the purpose and effect of altering legal rights, duties and relations of persons ... outside the legislative branch." *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 952, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1986). Action taken by the Committee of the Whole does, in many instances, have precisely that effect.[36]

In short, the Committee of the Whole *is* the House of Representatives for *most practical purposes.* For these reasons, the Court concludes that, to allow Delegates to cast votes in the Committee of the Whole, without qualification or condition, would be to invest them with legislative power in violation of Article I of the Constitution.[37]

---

be allowed to participate in any House committee deliberations and votes. *See Amicus Curiae* Brief filed on behalf of Republican Members of Congress at 8–18.

36. The Delegate for the District of Columbia was not far off the mark when she stated, upon passage of the new rules in January 1993 that on "99 percent of the business of the House, the District will have a vote...." Jenkins, *D.C. Wins Vote on House Floor, Washington Post*, January 6, 1993 at p. A1.

37. However, the Court concludes that allowing the Delegates to serve as the chair of the Committee of the Whole does not violate Article I. The chair of the Committee makes the initial determination of whether an amendment may properly be considered by the Committee of the Whole (*e.g.*, whether it is germane to the underlying bill). However, the chair's ruling is subject to appeal to the Committee of the Whole. Therefore, the mere vesting of the Delegates with the authority to chair the committee is not equivalent to allowing these Delegates to exercise legislative power.

## VII

### *Savings Clause*

This conclusion does not end the Court's inquiry into the issue raised by the current litigation. For the House of Representatives did not simply amend its rules to allow the Delegates to vote in the Committee of the Whole. Instead the House also adopted what has been termed a "savings clause," which reads as follows:

Whenever a recorded vote on any question has been decided by a margin within which the votes cast by the Delegates and the Resident Commissioner have been decisive, the Committee of the Whole shall automatically rise and the Speaker shall put that question de novo without intervening debate or other business. Upon the announcement of the vote on that question, the Committee of the Whole shall resume its sitting without intervening motion.

House Rule XXIII(2)(d).

What this rule means is that when a recorded vote in the Committee of the Whole is decided by a margin within which the Delegates' votes were decisive—*e.g.*, a five-vote margin or less if all the Delegates vote on an issue—that issue is *automatically* [38] referred out of the Committee of the Whole to the full House for a *de novo* vote without any intervening debate.[39] *And the territorial Delegates are prohibited from participating in this de novo vote.* Once that second vote is

cast and the results are announced, the Committee of the Whole resumes its deliberations on that piece of legislation.

In other words, when the votes of the Delegates do not affect the result in the Committee of the Whole, they are counted as part of the Committee's, and hence the House's, final decision; but when their votes make a difference in the result in the Committee of the Whole, their votes are not cast or counted in the second, decisive vote in the House itself.[40]

Thus, the central question facing the Court is whether this "savings clause" preserves the constitutionality of the rule change adopted by the House. On that issue, the defendants argue that the "savings clause" is just that: it protects the constitutionality of the provision allowing Delegates to vote in the Committee of the Whole if there otherwise were any doubt about constitutionality. The plaintiffs, on the other hand, contend that the "savings clause" does not save the legality of the basic rule change.

Plaintiffs offer four specific arguments to support their claim that the "savings clause" does not adequately void the effects of the Delegates' votes in the Committee of the Whole, and that the principal rule change is therefore unconstitutional despite the presence of that clause. The Court now considers each of these four arguments in turn.

---

As to the other duties of the chair, such as recognizing speakers, only through gross abuses of this power could this responsibility be used to exert "legislative power." Theoretically, a chair could refuse to recognize any members of the minority and thus influence the debate, but such a scenario is wholly implausible. In sum, in the normal duties of the chair there is no opportunity to exercise legislative power.

**38.** During the floor debates over these rule changes House Majority Leader Richard Gephardt (D–Mo.) engaged in an exchange with Rep. Robert Walker (R–Pa.) over the procedure for initiating this *de novo* vote. The two Members agreed that the rule is to be given its plain meaning, that a *de novo* vote is automatic, and that no Member needs to move for such a re-vote. 139 Cong. Rec. at H46 (January 5, 1993). *See also,* Transcript of February 9, 1993 Preliminary Injunction Hearing at 31–32 (hereinafter "Transcript").

**39.** Neither the defendants nor anyone else was able to forecast precisely what would happen under the "savings clause" with respect to the differing quorum requirements in the Committee of the Whole and the full House. *See* Transcript at 36–37. It is unclear, for example, what will occur, procedurally, when the Committee of the Whole is convened with more than the 100 Members required for a quorum, but less than the 218 Members needed for a quorum on the House floor. The Committee of the Whole could not automatically rise for a *de novo* vote under those circumstances; presumably the business of the House would be delayed while additional members were located and summoned to the floor of the House.

**40.** As Congressman Walker (R–Pa.) phrased it, Congress has told the Delegates: "when your vote counts, it doesn't count, but when it doesn't count, it counts." 139 Cong.Rec. at H70 (January 5, 1993).

## A. Unrecorded Votes

By its very terms, the "savings clause" applies only to "recorded" votes; under House Rule XXIII(2)(d), only such votes are required to be repeated in the House itself. The plaintiffs argue strenuously that this limitation represents a significant loophole because approximately half of the Committee of the Whole votes in the 102nd Congress were unrecorded.

In the view of the Court, this factor does not drain the "savings clause" of its force.

Under the House rules, a vote in the Committee of the Whole must be recorded "on request supported by at least twenty-five Members." Rule XXIII(2)(b). Thus, the standard for forcing a recorded vote in the Committee of the Whole is so minimal that restricting the "savings clause" to recorded votes only is not significant. It may even be that the new importance attached to the act of recording a Committee of the Whole vote under current House procedures (*i.e.*, triggering the "savings clause") would sharply increase the number of recorded votes. In any event, because of the very minor effort required to produce a recorded vote, the Court is not persuaded that a substantial number, if any, of Committee of the Whole votes under the new rules will go unrecorded where there is any doubt as to whether the Delegates' votes will be decisive.

## B. The "Horse Trading" Problem

The plaintiffs further argue that, under these rules, the Delegates will exercise legislative power in ways which cannot be detected by the "savings clause." Specifically, they contend that the rules will allow territorial Delegates to trade their votes with full Members of the House. The following example is cited to illustrate this point. The Delegate from Guam might make separate trades with twelve Members, securing a dozen votes against an amendment limiting funding for the U.S. naval presence on the island. If, as a consequence of these maneuvers, the amendment is defeated in the Committee of the Whole by more than five votes, it will not be reviewable by a new vote in the House. By this means, it is said, the Guam Delegate will have affected the outcome of legislation by securing those twelve extra votes in a manner that is not reviewable under the "savings clause."

The critical flaw in this theory, however, is that it assumes that Members of Congress with full votes both in the Committee and in the House will engage in trades with territorial Delegates when the vote these Members receive in the trade is meaningless. Returning to the example cited above, assume that the next vote is an amendment to close an Army base in the district of one of the Members. Assume further that a Member was assured of the Guam Delegate's vote against this amendment in return for a vote against the reduction in naval spending and activity in Guam.

However, if the Army base amendment is defeated by one vote (the Guam Delegate's), it is subject to *de novo* review in the House. The Delegate's vote then becomes meaningless because the fate of the Army base will be decided in the House itself only by full Members. On the other hand, if the amendment is defeated in the Committee of the Whole by over five votes, the Guam Delegate's vote will similarly be meaningless. The bottom line is that a Delegate's vote can *never make the difference between winning and losing.*

The plaintiffs have failed to provide the Court with any credible basis on which it may be assumed that a Member of the House of Representatives would trade with a Delegate for a vote that could never be decisive.[41]

---

**41.** Despite their very thorough preparation and research of these issues, counsel for the plaintiffs could not provide a persuasive explanation for this flaw in their "horse trading" argument. The record is devoid of an adequate basis upon which the Court could conclude that Members of the House of Representatives would defy common sense and trade their votes for the meaningless votes of the Delegates.

The plaintiffs did argue that a Member might trade for a Delegate's vote to buy precious time during the legislative process since a Delegate's vote could force a *de novo* vote. This time could be an "opportunity to secure other supporters, to make other trades." *See* Transcript at 9–10.

Since the "savings clause" requires a *de novo* vote without intervening debate or other business, presumably little time will pass before the

The affidavits submitted by the plaintiffs describe the legislative horse trading process, and the Court recognizes that such practices may be a daily fact of life on Capitol Hill. However, the Court will not assume that Members will trade something for nothing.[42]

Although the plaintiffs correctly note that votes are the "currency of the House"[43] for trading purposes, the fact is that under the January 1993 rules change the votes in the wallets of the Delegates are only counterfeit bills. They can never have a final effect on legislation in the House.

## C. Drafting of Amendments

 The plaintiffs further claim that because the Delegates are now empowered to vote in the Committee of the Whole, they will exert more influence over the drafting of amendments which are to be considered by that Committee. This claim is based on the theory that other legislators will consult with Delegates during the drafting of amendments in order to enlist their support.

This argument suffers from two difficulties. First, as with the horse trading scenario, the plaintiffs necessarily assume that a Member will move to amend legislation to appease a Delegate whose vote could ultimately not make the difference between defeat or passage of that amendment.

Second, if this type of influence qualifies as exercising legislative power, then the Delegates, by their mere presence in the House, and certainly by their votes in standing committees, already have legislative power. In the standing committees the Delegates have a vote, and presumably they contribute to the ultimate shape of the bills reported out of the committee.

Delegates also have at their disposal several other methods of influencing the text of various legislation and amendments. For example, they can speak on behalf of a bill during debates, lobby the Members, or offer an endorsement to a Member in exchange for certain changes in a proposed amendment. But none of these has ever been held to constitute the exercise of legislative power.

## D. Precedent–Setting Effect

Even if none of these defects existed, there is the underlying problem—as plaintiffs see it—that to permit Delegates to participate at all in the Committee of the Whole is a violation of the constitutional scheme. According to plaintiffs, if the House majority may permit Delegates—who are not Members—to participate in the deliberations of the Committee of the Whole, there would logically be nothing to preclude that same majority also from allowing such non-Members as the Clerk of the House, Members of the Canadian Parliament, or the general public, to participate. Even more, if the composition of the Committee of the Whole does not matter constitutionally, as defendants are said to claim, the House could presumably bar women or black legislators from participating in its deliberations, provided only that they retain their full votes in the House itself.

That argument is not well taken, on several levels. First of all, as it has made clear in this Opinion, the Court does not share defendants' view that the Committee of the Whole is a purely advisory body without the ability to exercise conclusive legislative authority. Although there is always the prospect that the House will reverse actions taken by the Committee of the Whole, the procedures for achieving this result are cumbersome and difficult to utilize. For that reason the

---

second vote. Moreover, even if the delay is more substantial, vesting Delegates with the power to prolong the proceedings in the Committee of the Whole is hardly the equivalent of granting them legislative power.

**42.** By their mere presence in the Congress, Delegates are able to engage in other types of trades which could potentially affect the outcome of legislation. For example, the Resident Commissioner from Puerto Rico could offer to make campaign appearances on behalf of a Member with a large Puerto Rican constituency in ex-

change for that Member's vote on a particular bill. The non-decisive vote in the Committee of the Whole is more akin to this type of bargaining chip already possessed by the Delegates. In other words, the vote that the House has given the Delegates only adds another arrow to the Delegates' quiver. It does not empower them with a completely new and potent weapon that may be equated with legislative power.

**43.** *See* Plaintiffs' Reply Memorandum in Support of Preliminary Injunction at 3.

House is not at liberty to take whatever action it pleases with respect to the composition or proceedings of the Committee of the Whole.

That leaves the question whether, for example, the House could decide that women or black Members will not be permitted to vote in the Committee of the Whole, as long as an automatic re-vote will be held when their votes might have been decisive (*e.g.*, the number of women Members exceeds the margin of victory in the Committee of the Whole).

██ Such unequal treatment of women or blacks, which the government would be unable to claim is either "substantially related to an important government interest," [44] or narrowly tailored to serve a compelling governmental interest,[45] would clearly run afoul of the Constitution. The Supreme Court has made it clear that in establishing the rules of its proceedings, the House is limited by the restrictions contained in the Constitution. *United States v. Ballin, supra,* 144 U.S. at 5, 12 S.Ct. at 509. Therefore, any rules adopted by the House regarding the procedures in the Committee of the Whole must comply with the Constitution.

That completely answers in the negative the question whether the House has the authority to exclude any individuals who are Members of the House from voting in the Committee of the Whole. As for the House's ability to *include* additional individuals in the Committee's proceedings, as it has done with respect to the Delegates, that poses a range of questions that the Court need not decide here.

Suffice it to say that the presence of the territorial Delegates in the House of Representatives is expressly provided for in statutes; and these statutes were enacted pursuant to explicit delegations of power contained in the Constitution authorizing Congress to

pass laws respecting the territories and the District of Columbia.

The federal laws creating the office of territorial Delegates are the tickets of admission to the proceedings of the House of Representatives. According to Hinds, a "territory or district must be organized by law before the House will admit a representative Delegate." II *Deschler's Precedents, supra,* ch. 7, § 3, at 35 n. 11 (*citing* I *Hinds', supra,* at 372–380). In crafting the House rules that are challenged here, the House is merely establishing the functions these Delegates will play in the legislative process short of exercising legislative power. As for others, *e.g.*, Members of the Canadian parliament or Democratic governors, they clearly could not, on such a basis, or any basis, be given a vote in the Committee of the Whole.

In sum, it is the conclusion of the Court that, while the new rules of the House of Representatives may have the symbolic effect of granting the Delegates a higher status and greater prestige in the House and in the Delegates' home districts, it has no effect, or only at most an unproven, remote, and speculative effect, as far as voting or the exercise of legislative power is concerned. Accordingly, the rule is not unconstitutional as the delegation of an improper exercise of legislative power.

## VIII

### *Bicameralism*

██ Plaintiffs challenge the recent changes in the House rules on the further basis that the Constitution explicitly confers on *Congress*, not on the House acting alone, the authority to regulate the District of Columbia and the territories.[46] They rely for this challenge primarily upon the congressional precedents. However these prece-

---

**44.** *See Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976) (establishing the standard to be applied to equal protection claims based on gender discrimination).

**45.** *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (standard to be applied to equal protection claims based on race discrimination).

**46.** The Constitution states that "Congress shall have power ... to exercise exclusive legislation in all cases whatsoever" over the District of Columbia. U.S. Const. art. I, § 8.

With regard to the territories, "Congress shall have the power to make all needful rules and regulations respecting" these entities. U.S. Const. art. IV, § 3.

dents are at best equivocal rather than to provide firm support for plaintiff's position.

In 1884 and in 1932, efforts to allow Delegates to vote in standing committees through simple changes in the House rules were abandoned because of concern that the House lacked the constitutional authority to take such action.[47] Similarly, when the Resident Commissioner from Puerto Rico was given the right to vote in standing committees, this change was accomplished by a statute—an amendment to the Legislative Reorganization Act of 1970. *See* Pub.L. No. 91–510, 84 Stat. 1140, 1162 (1970).

On the other hand, the House has on numerous occasions given Delegates significant power in standing committees by simple rules changes. Although the law creating the position of Delegate from the Northwest Territory only provided that the Delegate have "a seat in Congress, with a right of debating, but not voting ...," 1 Stat. 50, 52 (1789),[48] William Henry Harrison, then the Delegate in question, was given the chairmanship of a House standing committee by a unilateral House resolution passed in 1799. *See Goebel, supra,* at 44.[49] In his compilation of the history of the House, Asher C. Hinds noted that "in earlier practice Delegates appear to have voted in committees." II *Hinds', supra,* at 865.[50]

The more recent practice is even more illuminating. Thus, while, to be sure, the measure giving the Resident Commissioner

from Puerto Rico the right to vote in standing committees was accomplished in 1970 by statute, that same law also provided that the rules changes made by the statute were effected "with full recognition of the power of the House of Representatives to enact or change any rule...." *See* 84 Stat. at 1143 (1970). A year later, the House amended Rule XII to grant to the Delegate from the District of Columbia powers in the standing committees equivalent to those of the Resident Commissioner from Puerto Rico (*i.e.,* it provided the right to vote in such standing committees). *See* 117 Cong.Rec. 143 (daily ed. January 22, 1971). And in 1973 the House once again amended Rule XII making the language of the rule generic to all Delegates, thus authorizing all territorial Delegates to vote in standing committees. *See* 119 Cong.Rec. 18 (daily ed. Jan. 3, 1973). All of these changes were accomplished through amendment of the House's rules rather than through the enactment of legislation.

The bicameralism argument is further undermined by the text of some of the statutes creating the office of Delegate. The statute establishing the positions of Delegates from Guam and the Virgin Islands expressly provides that "the right to vote in committee shall be as provided by the rules of the House of Representatives." 48 U.S.C. § 1715 (1988). The law which created the office of Delegate from American Samoa granted that individual "whatever privileges

---

**47.** In 1884 the Speaker of the House questioned the House's authority to allow Delegates to vote in the committees on which they served. Speaker Carlisle refused to allow consideration of this proposal stating that "[i]t is contrary to the law; and, in the opinion of the Chair, the House could not, by a simple resolution, change the law upon the subject." Statement of Speaker John G. Carlisle, 15 Cong.Rec. 1334 (February 23, 1884). In 1932 the Subcommittee on Rules of the House Committee on Indian Affairs examined the question of allowing Delegates to vote in standing committees. The subcommittee concluded that the House lacked the authority to make this change because "nowhere in the Constitution or in the statutes can the intention be found to clothe delegates with legislative power." 75 Cong.Rec. 2163–64 (January 18, 1932).

**48.** In this respect, the 1789 statute is similar to those creating the positions of other Delegates. *See, e.g.,* 2 U.S.C. § 25a(a) (1988).

**49.** It is noteworthy that many of the Framers of the Constitution were Members of this early Congress.

**50.** As noted above, *see* Part III, *supra,* in reaching this conclusion, Hinds relied heavily on an 1841 congressional report which noted that:

> With the single exception of voting the delegate enjoys every other privilege and exercises every other right of a Representative. He can act as a member of a standing or special committee and vote on the business before said committees, and he may thus exercise an important influence on those initiatory proceedings by which business is prepared for the action of the House.

H.R.Rep. No. 10, 27th Cong., 1st Sess. 4–5 (1841).

and immunities that are, or hereinafter may be, granted to the non-voting Delegate from ... Guam." 48 U.S.C. § 1735 (1988). Contrary to the plaintiffs' claims, the House was acting in accordance with these precedents when it unilaterally acted to define the parameters of the Delegates' roles in its proceedings.

Other factors support the conclusion that the method chosen by the House for defining the role of the Delegates is not invalid.

First, the Supreme Court held in *United States v. Ballin, supra,* 144 U.S. at 5, 12 S.Ct. at 509, that "the Constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights." As this Court discusses in sections VI and VII, *supra,* the rule changes adopted by the House on January 5, 1993 do not vest the Delegates with legislative power.

These modifications of the Delegates' role in House proceedings do not have "the purpose and effect of altering legal rights, duties and relations of persons ... *outside* the legislative branch." *See Chadha, supra,* 462 U.S. at 952, 103 S.Ct. at 2784 (emphasis added). The Delegates do not have the ability to utilize their new voting rights to affect the outcome of legislation. The "savings clause" saps these votes of any real impact on the outcome of the House's deliberations. It follows that the House's action was not a legislative act subject to *Chadha*'s strictures of bicameralism and presentment.

Second, although the precedents are not uniform, the history of the House of Representatives supports the conclusion that the House may act unilaterally to fix the role Delegates are to play in the operation of this chamber. From the Congresses of the 18th century to the present, the House has, without resorting to statute, increased and modified the functions encompassed by the Office of Delegate. There is no basis for concluding that when the House decided on January 5, 1993 to increase marginally the role of the Delegates, the Congress had to enact a statute to accomplish this House objective.

Plaintiffs' argument based on bicameralism and the failure of the House to proceed by statute (rather than by rule) is therefore rejected.

IX

*Conclusion*

■ The nub of the case before the Court is this. If the only action of the House of Representatives had been to grant to the Delegates from the District of Columbia, Guam, Virgin Islands, and American Samoa, and the Resident Commissioner from Puerto Rico the authority to vote in the Committee of the Whole, its action would have been plainly unconstitutional. In view of the central place occupied by the Committee of the Whole in the legislative process, such a grant of authority would have improperly given to these territorial officials legislative power—a power which under Article I of the Constitution is reserved to *Members* of Congress elected by the people of the several *States.* The Delegates are clearly not in that category. It also would have improperly diluted the voting power of the legislative representatives of the States as well as of the citizens who elected them.

But the House also did something else. In addition to amending Rule XII which grants to the Delegates the authority to vote in the Committee of the Whole, it modified Rule XXIII which, in effect, took away what had been given by Rule XII.[51] Under Rule XXIII, whenever the votes of the Delegates are decisive to the outcome of any balloting in the Committee of the Whole, there is an automatic and immediate second ballot in the House itself, and in that ballot the Delegates are prohibited from participating.

On the basis of this record, the Court concludes that, while the action the House took on January 5, 1993 undoubtedly gave the Delegates greater stature and prestige both in Congress and in their home districts, it did not enhance their right to vote on legislation. In a democratic system, the

---

**51.** Interestingly, Rule XII was initially proposed in December 1992, while Rule XXIII surfaced a month later. Some Member or Members must have had doubts about the validity of Rule XII, and they were sufficiently astute to add Rule XXIII to the proposed rule change.

right to vote is genuine and effective only when, under the governing rules, there is a chance, large or small, that, sooner or later, the vote will affect the ultimate result. The votes of the Delegates in the Committee of the Whole cannot achieve that; by virtue of Rule XXIII they are meaningless. It follows that the House action had no effect on legislative power, and that it did not violate Article I or any other provision of the Constitution.

The Court holds that the rules adopted by the House of Representatives, considered in the aggregate, are valid, and judgment will accordingly be entered for the defendants.

### ORDER

Upon consideration of plaintiffs' motion for a preliminary injunction, defendants' motion to dismiss, the memoranda submitted in support thereof and in opposition thereto, the hearing held by the Court on these motions; the briefs filed by the *amici curiae;* the request by the parties to join the application for a preliminary injunction with final consideration of this action on the merits; and the entire record herein; it is this 8th day of March, 1993, in accordance with an Opinion issued contemporaneously herewith

ORDERED that plaintiffs' motion for a preliminary injunction be and it is hereby denied; and it is further

ORDERED that judgment be and it is hereby entered for defendants.