132 P.3d 397

**IDAHO PRESS CLUB, INC., an Idaho non-profit corporation, Plaintiff–Appellant,**

v.

**STATE LEGISLATURE OF THE STATE of Idaho; Robert L. Geddes, in his official capacity as President Pro Tempore of the Senate; and Bruce Newcomb, in his official capacity as Speaker of the House of Representatives, Defendants–Respondents.**

No. 31667.

Supreme Court of Idaho, Boise, January 2006 Term.

March 20, 2006.

Givens Pursley, LLP, and Allen R. Derr, Boise, for appellant. Debora K. Kristensen argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondents. James D. Carlson argued.

EISMANN, Justice.

This is an appeal from a decision holding that Article III, § 12, of the Idaho Constitution does not apply to legislative committee meetings. We affirm the judgment of the district court.

## I. FACTS AND PROCEDURAL HISTORY

On May 27, 2004, the Idaho Press Club, Inc., (Press Club) filed this action seeking a declaratory judgment holding that the conduct of the Senate and House in closing legislative committee meetings to the public violates Article III, § 12, of the Constitution of the State of Idaho. The Press Club alleged that during the 2003 and 2004 legislative sessions the Senate had closed four meetings of its legislative committees and the House of Representatives had closed three meetings of its legislative committees. The district court held that Article III, § 12, did not apply to meetings of legislative committees, and the Press Club appealed.

## II. ANALYSIS

Article III, § 12, of the Idaho Constitution provides, "The business of each house, and of the committee of the whole shall be transacted openly and not in secret session." The

issue before us is whether that provision requires all meetings of legislative committees to be open to the public. Our task is not to decide whether such meetings should be open. It is solely to decide whether the Constitution requires that they must be open.

■ "In construing the constitution, the primary object is to determine the intent of the framers." *Williams v. State Legislature,* 111 Idaho 156, 158–59, 722 P.2d 465, 467–68 (1986). That intent comes from the words approved by the drafters and later adopted by the people. "The presumption is that words used in a constitution are to be given the natural and popular meaning in which they are usually understood by the people who adopted them." *Taylor v. State,* 62 Idaho 212, 217, 109 P.2d 879, 880 (1941). "It must be kept in mind that the Constitution of the State of Idaho is not a delegation of power to the legislature but is a limitation on the power it may exercise, and that the legislature has plenary power in all matters for legislation except those prohibited by the constitution." *Idaho Tel. Co. v. Baird,* 91 Idaho 425, 428, 423 P.2d 337, 340 (1967). Thus, the question before us is whether Article III, § 12, limits the power of the legislature to close legislative committee meetings.

■ At the time Section 12 was adopted, a legislative house (which in this context refers to both the Senate and the House of Representatives) typically utilized two types of committees: (a) the committee of the whole and (b) smaller committees comprised of specified members of the house (herein "legislative committees"). Neither the committee of the whole nor a legislative committee can vote to pass a bill. That can only be done by the house when it is in session. Although there is some overlap in the functions of the committee of the whole and of legislative committees (e.g., they can both recommend the adoption of a bill), they are two distinctly separate entities. The committee of the whole is a parliamentary device for facilitating the legislative process in which all members of the house meet in the form of a committee. The legislative committees have a more limited function and are comprised of a smaller number of the house

members. Both the parliamentary device of the committee of the whole and legislative committees have been in use in Congress from its inception. It is clear that the delegates to the Constitutional Convention understood that they were distinctly different types of committees. Its rules provided both for forming a committee of the whole and for forming smaller committees ranging in size from five to nine members. *Proceedings and Debates of the Constitutional Convention of Idaho 1889,* Vol. I, pp. 37–41, 52–53 (I.W. Hart ed.1912). Indeed, the Press Club admits that the committee of the whole and a legislative committee are two entirely different types of committees.

■ At the time the Constitution was drafted and adopted, the legislative process involved the work of three distinctly different groups: the house, the committee of the whole, and legislative committees. Those three groups were recognized in the rules of the territorial legislature that first convened in 1863. Article III, § 12, specifies that its provisions apply to "each house" and to "the committee of the whole" of each house, but it makes no mention of legislative committees. "It is a universally recognized rule of construction that, where a constitution or statute specifies certain things, the designation of such things excludes all others." *Local 1494 of Int'l Ass'n of Firefighters v. City of Coeur d'Alene,* 99 Idaho 630, 639, 586 P.2d 1346, 1355 (1978), *quoting Peck v. State,* 63 Idaho 375, 380, 120 P.2d 820, 822 (1941). This rule of construction, which is typically stated in the Latin *expressio unius est exclusio alterius,* was first recited by this Court in *Shoshone County v. Profit,* 11 Idaho 763, 84 P. 712 (1906), and was recognized by the United States Supreme Court long before Idaho became a state, *The Adeline,* 9 Cranch 244, 3 L.Ed. 719 (1815).

■ "Our State Constitution is a limitation, not a grant of power, and the Legislature has plenary powers in all matters, except those prohibited by the Constitution." *Rich v. Williams,* 81 Idaho 311, 323, 341 P.2d 432, 439 (1959). Because the Constitution is not a grant of power, there is no reason to believe that a Constitutional provision enu-

merating powers of a branch of government was intended to be an exclusive list. The branch of government would inherently have powers that were not included in the list. The converse is true, however, with a respect to provisions limiting power. When the framers drafted a provision expressly limiting certain powers, there is no reason to believe that they intended the limitation to be broader than they drafted it. The purpose of such provision is to define the limitations. It is not reasonable to assume that they intended to impose other, unstated limitations. Had they wanted to impose limitations in addition to those stated, they could easily have done so. Therefore, the rule of construction *expressio unius est exclusio alterius* applies to provisions of the Idaho Constitution that expressly limit power, *Clayton v. Barnes*, 52 Idaho 418, 16 P.2d 1056 (1932); *Shoshone County v. Profit*, 11 Idaho 763, 84 P. 712 (1906), but it does not apply to provisions that merely enumerate powers, *Penrod v. Crowley*, 82 Idaho 511, 356 P.2d 73 (1960); *Eberle v. Nielson*, 78 Idaho 572, 306 P.2d 1083 (1957). The provision at issue here is a limitation on the power of the legislature to close its proceedings. Thus, *expressio unius est exclusio alterius* applies as a rule of construction. Under this well-recognized rule of construction, Article III, § 12, does not apply to legislative committees because the drafters did not include such committees in its provisions. In fact, the Press Club correctly admits, "Significantly, *the ability to close committee meetings was never discussed or raised as a concern by the constitutional delegates.*" (Emphasis in original.) None of the delegates argued that legislative committee meetings should be either open or closed. That is simply not a matter they were concerned about. The drafters could have written Section 12 to require that the business of each house and of all committees shall be transacted openly and not in secret session, but it did not do so.

The Press Club contends that the phrase "business of each house" should be construed to include legislative committees. It argues that because each house utilizes legislative committees in order to function, the work of such committees is included in the phrase "business of each house." There are three problems with this argument.

■ First, both houses also utilize the committee of the whole as part of the legislative process. If the "business" of each house was intended to include the work of all committees, then it would also include the committee of the whole, which is a committee. If the word "business" included the work of all committees, then there would have been no reason to expressly include the committee of the whole within the provisions of Article III, § 12. The reference to the committee of the whole would be mere surplusage. We should avoid an interpretation which would render terms of a constitution surplusage. *Westerberg v. Andrus*, 114 Idaho 401, 757 P.2d 664 (1988).

Second, adopting the Press Club's definition of "business" would create an inconsistency. Article III, § 10, states, "A majority of each house shall constitute a quorum to do business." If legislative committees are included within the "business" of each house, then a majority of each house would have to be present at each meeting of a legislative committee because such committee meetings would constitute doing the business of the house. Nobody contends that a majority of the members of each house are required to be present at meetings of legislative committees. There is certainly no indication that the framers of the Constitution thought that the business for which a quorum was required by Article III, § 10, included conducting legislative committees. For example, Rule 23 of the rules adopted by the Constitutional Convention to govern its proceedings provided, "A majority of members elected to the convention shall be necessary to constitute a quorum to do business." *Proceedings and Debates of the Constitutional Convention of Idaho 1889*, Vol. I, p. 49 (I.W. Hart ed.1912). They obviously did not think the business that required a quorum to be present included the work of standing committees. There were sixty-four delegates, but only five to nine members of each standing committee. *Id.*, pp. 38–41, Vol. II, p.2090.

■ To avoid that inconsistency, we would have to hold that the word "business" in Section 12 has a different meaning from

the word "business" in Section 10. In Section 10, it would only refer to what occurs on the floor of the house when it is in session, while in Section 12 it would refer to what occurs anywhere in the legislative process, including in committee meetings when the house is in recess. However, provisions of the Constitution, insofar as they relate to the same subject matter, must be construed together. *Idaho Tel. Co. v. Baird*, 91 Idaho 425, 428, 423 P.2d 337, 340 (1967). There is nothing in the context of the two sections indicating that "business" in Section 10 must mean something different from "business" in Section 12.

Third, the argument is contrary to the history surrounding the adoption of Article III, § 12. The version originally approved by the delegates (First Version) permitted secret legislative sessions to enact legislation. *Proceedings and Debates of the Constitutional Convention of Idaho 1889*, Vol. I, p. 527 (I.W. Hart ed.1912). It stated, "The doors of each house and of the committee of the whole shall be kept open except in such cases as in the opinion of either house may require secrecy." Mr. Standrod moved to strike that portion of the First Version that would permit secret legislative sessions, and that motion carried by a vote of thirty to seven. *Id.*, Vol. II, pp. 1217, 1223. Section 12 then read, "The doors of each house and of the committee of the whole shall be kept open." This version (Second Version) was later adopted. *Id.* at 1227. Before it was adopted, however, Mr. Parker proposed an amendment to add "at all hours when the legislature is in session," which was defeated. *Id.* Mr. Claggett moved to add a proviso that the Senate could sit in secret session when acting on nominations made by the governor, but the delegates narrowly rejected that amendment by a vote of twenty ayes to twenty-four nays. *Id.* at 1227.

The delegates later struck the Second Version on motion of Mr. Pinkham. *Id.* at 1269–71. Mr. Pinkham was concerned that its wording made no sense. As he argued, "I will read the section as it now stands. 'The doors of each house and of the committee of the whole shall be kept open'—kept open when? Kept open during the day or during the night or on Sundays or for what purpose? I can find no sense in it at all." *Id.* at 1270. Mr. Ainslie then proposed the substitute (Current Version), which was adopted. *Id.* at 1271. The substitute offered by Mr. Ainslie was not proposed as an expansion of the scope of the Second Version. It was simply intended to improve the wording of the provision. The delegates had debated at length what legislative proceedings should be open to the public before adopting the Second Version. There was no similar debate concerning the adoption of the Current Version. In fact, Mr. Pinkham was the only delegate who offered any debate.

The Press Club and the dissent quote from statements made by delegates at the Constitutional Convention to argue that we should give Article III, § 12, a meaning broader than the language used in the provision. We cannot use the arguments of the delegates to expand the meaning of a constitutional provision beyond its wording. The delegates at the convention voted to approve and the citizens of Idaho voted to adopt the wording chosen for Article III, § 12, not the arguments of some of the delegates. *See Keenan v. Price*, 68 Idaho 423, 195 P.2d 662 (1948).

Throughout the debate concerning Article III, § 12, there was no discussion regarding whether legislative committee meetings should be open or closed to the public. The delegates quoted were arguing against permitting secret sessions of the legislature, not against closing meetings of legislative committees. To apply their arguments to an issue they were not even addressing is simply putting words in their mouths. For example, thirty delegates voted to ban secret legislative sessions, but only twenty-four voted to ban secret senate sessions during confirmation proceedings. What the vote would have been had the delegates been presented with the issue of requiring all legislative committee meetings to be open to the public is simply a matter of speculation. Only ten of the thirty-seven delegates who voted on the amendment to prohibit closed legislative sessions participated in the debate. Seven spoke in favor of the amendment, and three spoke against it. Words spoken by seven delegates regarding closed legislative ses-

sions do not reflect how either they or the thirty other delegates would have voted regarding closed legislative committee meetings.

At the time of Idaho's Constitutional Convention, legislative committee meetings were generally closed to the public. The public had no common-law right to attend meetings of government bodies. *Society of Prof'l Journalists v. Secretary of Labor,* 616 F.Supp. 569 (D.C.Utah 1985). The tradition in England was to hold legislative debate in secret and to prohibit publication of legislative proceedings, and that tradition was exported to colonial America. *Id.* Both the Continental Congress and the Constitutional Convention conducted their proceedings in secret. *Id.* The United States Senate began holding its sessions in public in 1794, *Id.,* but it was not until the 1920's that it opened confirmation proceedings to the public. In fact, Mr. Gray, a delegate to the Idaho Constitutional Convention, stated, "If I understand it, on confirmations and matters of that kind, they generally have secret sessions." *Debates of the Constitutional Convention of Idaho 1889,* Vol. II, pp. 1217 (I.W. Hart ed.1912). The United States House did not open its sessions to the public until after the War of 1812. *Society of Prof'l Journalists v. Secretary of Labor,* 616 F.Supp. 569 (D.C.Utah 1985). Even after Congress opened its sessions to the public, its legislative committee meetings typically remained closed to the public. It was not until 1946 that Congress first acted to open its legislative committee meetings to the public, but even then they were closed during "executive sessions for marking up bills or for voting or where the committee by a majority vote orders an executive session." [1]

Idaho was the forty-third state in the nation. At the time Idaho became a state, no state constitution prohibited the legislature from closing legislative committee meetings. In only three states were the legislatures prohibited from holding secret sessions to adopt legislation. The constitutions of eleven states [2] did not place any limits at all on closing legislative proceedings to the public; the constitutions of twenty-eight states [3] provided for open legislative sessions, but permitted each house to close any sessions that, in its opinion, required secrecy; and the constitutions of three states [4] required open legislative sessions, but permitted the senate to close its executive sessions.

Thus, at the time of the Idaho Constitutional Convention, legislative committee meetings were typically closed to the public. There is no reason to believe that the delegates were unaware of that fact. Had they intended to prohibit the legislature from closing all such committee meetings, one of the delegates would certainly have mentioned that issue when they were debating the particular proceedings that the legislature should be prevented from closing to the public.

■ The Press Club and *amicus curiae* also present various policy arguments as to why legislative committee meetings should always be open. We cannot use policy arguments to give a constitutional provision a meaning that is not consistent with its wording. Such policy reasons could certainly be considered by the legislature when deciding whether to permit its committee meetings to be closed. They may also support a constitutional amendment broadening the scope of Article III, § 12. We cannot use them, how-

---

1. The Legislative Reorganization Act of 1946, § 133, *United States Code Congressional Service, Laws of 79th Congress, Second Session, January 14 to August 2, 1946* (St. Paul, Minn: West Publishing Co., 1946), p. 796, provided, "All hearings conducted by standing committees or their subcommittees shall be open to the public, except executive sessions for marking up bills or for voting or where the committee by a majority vote orders an executive session."

2. Georgia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, New Jersey, North Carolina, Rhode Island, Virginia, and West Virginia.

3. Alabama, Arkansas, California, Colorado, Connecticut, Delaware, Illinois, Indiana, Iowa, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New York, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Vermont, Washington, and Wisconsin.

4. Florida, Nevada, and Texas.

ever, to vary the plain meaning of that constitutional provision.

■ Finally, *amicus curiae* argue that Article I, § 10, of the Constitution requires that legislative committee meetings be open. They rely upon the provision stating, "The people have the right ... to instruct their representatives...." According to *amicus curiae*, the right to instruct representatives must include the right to attend legislative committee meetings. Provisions of the Constitution apparently in conflict must be reconciled if at all possible. *Engelking v. Investment Bd.*, 93 Idaho 217, 458 P.2d 213 (1969). If there is an irreconcilable conflict, specific provisions prevail over general provisions. *Id.* Article I, § 10, does not specify the manner in which the people have the right to instruct their representatives. It does not, by its terms, purport to require that legislative committee meetings be open. Even if we were to conclude that its provisions conflicted with those of Article III, § 12, the latter, being specific, would prevail.

Using the recognized rules of construction, Article III, § 12, does not apply to legislative committee meetings. Where the Constitution does not limit the power of the legislature to close its legislative committee meetings, we do not have the power to order that they be open. We cannot exercise any powers properly belonging to the legislature, Idaho Const. Art. II, § 1, and the powers of each house include the power to "determine its own rules of proceeding," Idaho Const. Art. III, § 9.

The Press Club also seeks an award of attorney fees under the private attorney general doctrine. Because it did not prevail on this appeal, it cannot qualify for an award of attorney fees under that doctrine. *Uhl v. Ballard Med. Prods., Inc.*, 138 Idaho 653, 67 P.3d 1265 (2003).

### III. CONCLUSION

We affirm the judgment of the district court, and award costs on appeal to the respondents.

Chief Justice SCHROEDER and Justice TROUT concur.

JONES, J., dissenting.

I am unable to read the Idaho Constitution in such a fashion as to allow the State Legislature, which was established by the people, to have the ability to exclude the people from any stage of the lawmaking process. The majority opines that since committees are not specifically mentioned in art. III, § 12 as being subject to the prohibition against transacting business in secret session, the Legislature can close committee meetings to the public. On the other hand, there is no provision in the Constitution that authorizes or provides for the Legislature to establish committees to conduct any of its legislative business. Just because the Legislature has chosen to conduct a good deal of its work in its various committees does not mean that the legislative business conducted in those committees can be shielded from public view. Based on my understanding of the role of committees and the history of art. III, § 12, I simply cannot accept the notion that the people would require the Legislature to conduct the people's business in public yet intended to permit the Legislature to create smaller forms of itself and conduct that business behind closed doors. Therefore, I respectfully dissent.

### I.

"The fundamental object in construing constitutional provisions is to ascertain the intent of the drafters by reading the words as written, employing their natural and ordinary meaning, and construing them to fulfill the intent of the drafters." *Sweeney v. Otter*, 119 Idaho 135, 139, 804 P.2d 308, 312 (1990). We should also give constitutional provisions a " 'reasonable and practical interpretation, in accord with common sense.' " *Taylor v. State*, 62 Idaho 212, 231, 109 P.2d 879, 887 (1941) (Morgan, J., dissenting, citing 16 C.J.S. 50). As the majority accurately observes, something called a "committee" is obviously not "each house" or "the committee of the whole." If one deems it necessary to begin and end the inquiry by examining only the words "each house" and "committee of the whole," one might arrive at the majority's holding. However, in my view such a

reading overlooks the *meaning* of the words in art. III, § 12. To ascertain the meaning of that provision, one must consider it in its constitutional context and understand the nature and role of legislative committees in our constitutional scheme.

### A.

It is undisputed that all political power in our system derives from the people. Indeed, Article I, Section 2 of the Idaho Constitution boldly states: "All political power is inherent in the people." The people delegated the legislative function of their political power to the Legislature. Idaho Const. art. III, § 1. However, the delegation was not wholesale. The people reserved in themselves the power to enact their own laws and to repeal laws enacted by the Legislature. *Id.* They also maintained the right to instruct their representatives. Idaho Const. art. I, § 10. There is no indication in the Constitution that the people intended their right to instruct to stop at the doors of a closed committee meeting.

By definition, the Legislature exists "[t]o make or enact laws." BLACK'S LAW DICTIONARY 911 (7th ed.1999). That, therefore, is "[t]he business *of*" each house and the committee of the whole. *See* MIRRIAM-WEBSTER ONLINE (available at http://www .m-w.com) (defining "business," in the possessive sense, as role or function).[5] The houses of the Legislature, the committee of the whole, and the legislative committees each fill a niche in the lawmaking process.

### 1.

That each house, the committee of the whole, and legislative committees are "three distinctly different groups" is significant only in labeling their form. Only the House and the Senate conduct binding votes on legislation, thus formally moving it from one house to the other, and from the legislative branch to the executive's desk. These votes are the last step in carrying out the legislative process. Prior to a vote, much work must be done. Enter the committee of the whole and

legislative committees. In parliamentary parlance, the committee of the whole is the whole house acting as a committee. *See* Luther S. Cushing, *Rules of Proceeding and Debate in Deliberative Assemblies* 153 (rev. ed. by Edmund L. Cushing 1878). The committee of the whole originated as an informal deliberative body in seventeenth-century England, created by members of Parliament to debate and vote on matters outside the watchful eyes of the King's "spy" in Parliament—the Speaker. *See Michel v. Anderson,* 817 F.Supp. 126, 131 (D.D.C.1993) (citing 139 Cong. Rec. at H27–28 (Memo. of Don Wolfensberger) (Jan. 5, 1993)). The practice continued in colonial America, so members of colonial legislatures could avoid detection by King George III's henchmen. *Id.* (citing IV Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States* 986–87 (1907)).

It continued in the Continental Congress, the Congress of the Confederation, and the Federal Convention where the U.S. Constitution was drafted. *Michel,* 817 F.Supp. at 131 (citing Wolfensberger Memo., 139 Cong. Rec. at H28). The delegates at our Idaho Constitutional Convention used the committee of the whole, as well. I *Proceedings and Debates of the Constitutional Convention of Idaho 1889* 52–53 (I.W. Hart ed.1912) (hereinafter *"Proceedings and Debates"*). Today, the committee of the whole still has no authority to formally pass any bill, but remains as a procedural tool to facilitate full-house debate on pending legislation. *See Mason's Manual of Legislative Procedure* § 683 (2000) (hereinafter "Mason's Manual"); *see also* Idaho Sen. R. 22; Idaho House R. 48. Our Constitution, rather than shielding such proceedings from public view, as had been done in the past, departed from tradition and required the business of the committee of the whole to be conducted in full public view.

### 2.

Attendant to the Legislature's lawmaking authority is the authority to determine its

---

**5.** Only context and common sense can pin down the definition of "business." Mirriam–Webster offers no fewer than ten definitions of the word.

own rules of proceeding. Idaho Const. art. III, § 9.[6] Presumably in reliance on this provision, each house has created a handful of committees, which are comprised of some number of legislators from the particular house. *See* Idaho Sen. R. 19, 20; Idaho House R. 53. That committees conduct "[t]he business of" each house cannot be seriously disputed. For starters, the Legislature, at least on its website, says so. *See How a Bill Becomes a Law,* Idaho State Legislature (available at http://www. legislature.idaho .gov/about/howabill becomesalaw.htm) (noting that "[e]ach committee to which a bill is referred conducts a study of all information that may help the committee determine the scope and effect of the proposed law").

The very manual each house has adopted[7] agrees: "Committees are instruments or agencies of the body appointing them, and their function is to carry out the will of that body." Mason's Manual § 615(1) (2000); *see also* BLACK'S LAW DICTIONARY 267 (defining committees as "[a] group of legislators appointed to *help the legislature conduct its business,* esp. by providing careful consideration of proposals for new legislation within a particular field so that the entire body can handle its work efficiently without wasting time and effort on unmeritorious submissions") (emphasis added).

Delegating much of the task of lawmaking to committees is not some newfangled concept. Cushing—whose 1878 manual was adopted by the delegates at our convention—notes:

> Committees are appointed to consider a particular subject either at large or under special instructions; to obtain information in reference to a matter before the assembly, either by personal inquiry and inspection, or by the examination of witnesses; and to digest and put into the proper form, for the adoption of the assembly, all reso-

lutions, votes, orders, and other papers, with which they may be charged.

Cushing at 154. Not only do committees *do* the work related to lawmaking, but they are vital to that process. Cushing observes:

> The advantages of proceeding in this mode are manifold. It enables a deliberative assembly to do many things which, from its numbers, it would otherwise be unable to do; to accomplish a much greater quantity of business, by dividing it among the members, than could possibly be accomplished if the whole body were obliged to devote itself to each particular subject ...

*Id.* at 153–54. Cushing sums up committees as being the "eyes and ears" of the body, and, "for certain purposes they are also its 'head and hands.'" *Id.* at 154. The delegates of our constitutional convention understood this, too, as they divided up the task of framing our constitution into several committees which then reported to the full convention. Interestingly, the committee of the whole performed a similar function on the macro level.

So it can be readily seen that committees owe their entire existence to, are controlled by, and conduct "[t]he business of," the Legislature when they are considering legislation. Put differently, committees are necessarily components of each house. If they did not exist, the Legislature would have to do that work itself—and that work, of course, would be subject to art. III, § 12.

**B.**

And it is equally obvious that it was the legislative process, not the form of the body conducting it, that the delegates were concerned about. With the sole exception of whether the Senate should be able to hold executive sessions to consider nominations made by the governor, never was there expressed any intent to close any part of the

---

**6.** The Legislature seems to argue that this constitutional provision blocks the Court from interfering with its decision to close committee meetings. And the majority cites this provision and states that the Court "cannot exercise any powers properly belonging to the legislature" for essentially the same point. Of course, I doubt seriously that anyone would believe that art. III,

§ 9 would allow the Legislature to implement a rule that ran counter to another provision of the constitution. *Cohn v. Kingsley,* 5 Idaho 416, 436, 49 P. 985, 992 (1897).

**7.** *See* Idaho Sen. R. 48; Idaho House R. 10.

lawmaking process. Rather, as we shall see, full openness was presumed.[8]

### 1.

Delegate Parker stated that he was "opposed to dark lantern or star chamber proceedings," and observed that "[t]he legislature has our lives, liberties, and happiness at its hand, and I want the electric light of publicity turned upon *every act* that they do." II *Proceedings and Debates* 1216–17 (emphasis added). Other participants expressed similar sentiments.

During the debate, the convention considered whether to exempt the Senate from the openness requirement when it considers nominations. With regard to this proposal, Mr. Shoup stated that representatives "should say nothing nor cast any vote but what everybody and especially all of his constituents should know just how he voted, and every word he said." *Id.* at 1217. He concluded, "everything he does in his official duties should be public." *Id.* Mr. Hasbrouck concurred, saying that "I do not believe there is any more necessity of anything being secret in a legislature than there is in a court ..." *Id.* at 1218. Mr. Mayhew stated: "I believe that in truth and in reason there is no occasion for any executive session in the senate of the state.... I am opposed to having any secret executive session of the *legislature* of the state." *Id.* at 1218–19 (emphasis added). Mr. Ainslie said: "I believe the people have a *right to know everything* their representatives are doing in the *legislature,* and I am in favor of having all such matters above board, and not allowing secret sessions ..." *Id.* at 1219–20 (emphasis added). Finally, Mr. Parker rose again: "We have given all our powers and rights to the *legislature,* and if you give the *legislature* the power to transact its business in secret, the last vestige of representative government has departed from the people." *Id.* at 1222 (emphasis added).

These comments pertained to the only proposed exception to the general openness requirement—they did not refer specifically to committees. But because committees are not separable from their parent bodies for purposes of interpreting art. III, § 12, I find it extremely doubtful that they intended committees to be outside the purview of art. III, § 12. Mr. Parker's statement was submitted in support of language in art. III, § 12 that would keep the doors of the Legislature open—"The doors of each house and the committee of the whole shall be kept open." II *Proceedings and Debates* 1223. However, as we know, that is not the final wording of the provision. Mr. Pinkham's confusion regarding the meaning of "the doors" caused the substitution of the word "business." This substitution, when considered in the context of the preceding debate, made it clear that the prohibition of secrecy was not confined to what occurred within the *chamber doors of the House and Senate.* "Business" simply clarified what the delegates were attempting to achieve—an open legislative process.

### 2.

The majority rests its holding primarily on the concept of *expressio unius est exclusio alterius,* i.e., that the listing of some things excludes all others. As applied in this case, this maxim assumes that the omission of committees from art. III, § 12 necessarily demonstrates intent to exclude them: "The drafters could have written Section 12 to require that the business of each house and of all committees shall be transacted openly, and not in secret session, but did not do so."

I do not agree that silence in this case demonstrates intent. To be sure, *expressio unius* is a longstanding principle of this Court and I believe in its application when the justification underlying it exists. But, as Judge Posner has put it, "Not every silence is pregnant; *expressio unius est exclusio*

---

8. The majority writes that the Court "cannot use the arguments of the delegates to *expand* the meaning of a constitutional provision beyond its wording." (Emphasis added.) I would agree with that statement. But while I agree that the delegates' statements at the convention cannot be used to *expand* the meaning of the provision

*beyond its wording,"* I do not agree that the Press Club has argued that the court should give art. III, § 12 "a meaning broader than the language used in the provision." The Press Club's argument is simply that committees are within the contemplation of art. III, § 12.

*alterius* is therefore an uncertain guide...." *Illinois Dep't of Public Aid v. Schweiker*, 707 F.2d 273, 277 (7th Cir.1983). Indeed, the maxim is a tool of construction, not "an unimpeachable rule of law." *Noble v. Glenns Ferry Bank, Ltd.*, 91 Idaho 364, 367, 421 P.2d 444, 447 (1966). Whether it applies depends in all instances on "whether the legislative intent appears clear in terms of the statute." *Id.* If the intent does not so appear, then intent is to be "collected from the context" and "according to what is consonant with reason and good discretion." *Id.* (citing *Offield v. Davis*, 100 Va. 250, 40 S.E. 910, 912 (1902) (internal quotation marks omitted)). Thus, courts refuse to apply the maxim when the drafters' intent is to the contrary. *See People v. Saunders*, 232 Cal.App.3d 1592, 1596, 284 Cal.Rptr. 212, 214 (Cal.Ct.App. 1991) (maxim is subordinate to primary rule that intent governs interpretation); *State v. Carpenter*, 616 N.W.2d 540, 543–44 (Iowa 2000); 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.23, p. 318 (6th ed.2000) (maxim does not apply if there is a "special reason for mentioning one thing and none for mentioning another which is otherwise within the statute").[9]

The required assumption underlying the maxim enjoys only fragile integrity in the first place. *See* Cass R. Sunstien, *Law and Administration after Chevron*, 90 Colum. L.Rev.2071, 2109 n. 182 (1990) (*expressio unius* "is a questionable [maxim], in light of the dubious reliability of inferring specific intent from silence"); Max Radin, *Statutory Interpretation*, 43 Harv. L.Rev. 863, 873–74 (1930) (characterizing *expressio unius* as "one of the most fatuously simple of logical fallacies, the 'illicit major,' long the *pons asinorum* of schoolboys"). Thus, blind adherence to it is flatly illogical. When we look to the debates, we simply cannot find the justification underlying the maxim's applicability. There was, as the majority states, no reference to committees. The majority infers from this silence intent to exclude committees. The support for this inference is simply not there. Not only was there no reference to committees, neither was there ever debate about the committee of the whole. It simply tagged along and was, without explanation, included in the initial and eventual versions of art. III, § 12. The only substantial debate was about whether to allow the Senate to hold secret sessions for gubernatorial appointments. II *Proceedings and Debates* at 1222–23. (Doubtless, these confirmations would have been considered to some extent in committee.) Yet, in spite of the general tradition that confirmations were held in secret, the delegates instead opted for total openness. So, again with the exception of the Senate when considering nominations, we cannot say that there was any debate about which, if any, body should be subject to the openness requirement. Thus the inference that committees were intended to be excluded is tenuous, at best.

Moreover, as I have explained, committees are not different from, but necessarily within the contemplation of, each house and the committee of the whole. The United States Supreme Court has aptly explained the associative relationship necessary to support the maxim:

> [*expressio unius*] properly applies only when in the natural association of ideas in the mind of the reader that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference that that which is omitted must be intended to have opposite and contrary treatment.

---

9. *Expressio unius* is a doctrine generally applied when other more reliable rules of statutory construction fail and should therefore be employed with caution, especially when being used in a constitutional context. This Court has not used it frequently in the constitutional setting and, when it has been discussed in that context, the results have been inconsistent. In *Shoshone County v. Profit*, 11 Idaho 763, 84 P. 712 (1906), and *Clayton v. Barnes*, 52 Idaho 418, 16 P.2d 1056 (1932) the Court applied it to the Constitution. However, in *Eberle v. Nielson*, 78 Idaho 572, 306 P.2d 1083 (1957), without discussing either *Profit* or *Clayton*, the Court flatly stated, "the rule of expressio unius est exclusio alterius has no application to the provisions of our State Constitution." 78 Idaho at 578, 306 P.2d at 1086. Three years later, in *Penrod v. Crowley*, 82 Idaho 511, 356 P.2d 73 (1960), the Court reiterated that the rule "does not apply to provisions of the state constitution." 82 Idaho at 523, 356 P.2d at 80. There was no language in either of these two cases to indicate the rule applied in some instances but not in others.

*Ford v. United States,* 273 U.S. 593, 611, 47 S.Ct. 531, 537, 71 L.Ed. 793, 801 (1927). Here, that which is expressed is not so set over by way of strong contrast to that which was omitted. Thus, we simply have no reason to infer, as rigid application of *expressio unius* might dictate, that the omission of committees was intentional.

Furthermore, application of *expressio unius* in this case does not comport with common sense. As the Arkansas Supreme Court has put it,

> it appears to us somewhat incongruous that a parent body cannot go into executive session ... but its component parts (the committees) which actually investigate the complaints, and act on those complaints by making recommendations to the board, are at liberty to bar the public from their deliberations. Surely a part (of a board) is not possessed of a prerogative greater than the whole.

*Arkansas Gazette Co. v. Pickens,* 258 Ark. 69, 522 S.W.2d 350, 354 (1975) (holding committees of university trustees' board subject to open meeting provision in state's freedom of information law, where law did not specifically mention committees).

The potential mischief of rigidly applying the doctrine can be seen in the context of art. III, § 9. This is the provision which the Legislature contends gives it authority to establish committees. However, art. III, § 9 gives each house a number of powers, including the power to "determine its own rules of proceeding," but does not give either house the ability to establish committees and does not allow for delegating any of the legislative workload to committees. By applying *expressio unius* to its logical (perhaps, illogical) end, one could argue that by virtue of not specifically allowing either house to establish committees, no part of the legislative workload can be delegated to committees and all of the legislative process must occur in non-secret sessions of each house or the committee of the whole. At the time the Constitution was adopted, the word committee did not appear in Art. III. By virtue of a 1976 amendment, the words "committee chairmen" were added to provide for certain per diem for those individuals. If art. III,

§ 12 is construed to not apply to committees, perhaps it was the intent of the constitutional drafters that the Legislature not be empowered to establish committees by virtue of the omission of that authority in art. III, § 9.

The further potential mischief of the majority's conclusion is illustrated when, for example, it is applied to the so-called speech-and-debate clause, found in art. III, § 7. That section provides that no member, "for words uttered in debate in *either house,* [shall] be questioned in any other place." (Emphasis added.) Applying the Legislature's distinct entity/*expressio unius* theory, it seems to me, would limit the speech-and-debate clause to debate, literally, in "either house." In other words, members could be sued for comments made when the House or Senate have resolved into the committee of the whole or for comments made in committee hearings. Whether this was the drafters' intent, I do not express an opinion. But in answering the question would we look solely at the bare words? I submit that this example demonstrates the need to look not beyond, or merely at, the words, but to truly ascertain the meaning of them.

### 3.

And there is yet another reason why silence in this case does not demonstrate intent to allow closed committee meetings. The majority presupposes that art. III, § 12 is a limit on the inherent authority of the Legislature to close its proceedings. However, on those occasions that we have applied *expressio unius* to constitutional provisions, we were not dealing with questions relating to the relationship between the people's inherent political power and the extent to which the people authorized the Legislature to transact its business behind closed doors. Instead, we were dealing with the extent of a clearly delegated power. For instance, in *Profit, supra* n. 5, the question concerned a constitutional provision (art. XVIII, § 3) that when part of a county left the county and joined another county, the jettisoned part of the old county was liable for its ratable portion of liabilities. 11 Idaho at 771, 84 P. at 714. The Court held that under *expressio unius,* since the provision said one

part of the territory paid those liabilities, that meant that no other territory did. *Id.* In *Clayton, supra* n. 5, the Court held that where art. XVIII, § 6 provided county commissioners could hire counsel whenever necessary, that provision limited county commissioners' authority to hire counsel and denied all other county officials the authority to hire counsel. 52 Idaho at 424, 16 P.2d at 1058.

On the other hand, in *Eberle v. Nielson, supra* n. 5, the Court ruled that a constitutional provision allowing compensation for a legislator's services did not prevent the Legislature from enacting a law providing for compensation of $5 per day for serving on a committee. In this case, there *was* a preexisting right, established by the Constitution, to pay legislators for their services. That compensation fell within the constitutional provision and, in the absence of limiting language in the constitutional provision, the statute was not unconstitutional. 78 Idaho at 580, 306 P.2d at 1087.

The majority tells us that there was no common-law right to attend government meetings. It notes the English and Colonial history and explains that the United States Senate began holding its sessions in public in 1794 and that the House started doing so after the war of 1812. And, we are told, U.S. House and Senate committee meetings were not opened until 1946 and their rules still contain provisions for closed sessions. However, the Federal Constitution contains nothing like our art. III, § 12, prohibiting secret sessions. Indeed, the Federal Constitution (art. I, § 5) authorizes either house to maintain secrecy of parts of its journal of proceedings. Although the Idaho Constitution does not specifically prohibit keeping the Legislature's journals secret, a reasonable reading of art. III, § 12 would surely prohibit the practice.

We are also told that when Idaho's Constitution was drafted, state legislative committee meetings were typically closed. We are not cited to a source telling us this but, instead, we are directed to the constitutions of the 42 states that joined the Union before Idaho did. Among them, there was either no express requirement that legislative meetings or committee meetings be open, or there was a requirement of openness but an exception when secrecy was desired or for the senate to hold executive sessions. That's fine, but we did have an openness requirement, and the delegates, even when Mr. Gray noted that "confirmations and matters of that kind" are generally held in secret, opted to depart from the norm and allow no such exception. Because our history and our Constitution are unique to our State,[10] we should rely on that, not on what had been happening in other states or in the federal system.[11]

## II.

In spite of the reality that legislative committees conduct "[t]he business of" the Legislature and in spite of the statements of the delegates themselves, the majority nevertheless holds that "[t]he business," as found in art. III, § 12, is defined by art. III, § 10. That provision provides, in full:

A majority of each house shall constitute a quorum to do business; but a smaller number may *adjourn* from day to day, and may compel the attendance of absent members in such manner and under such penalties as such house may provide. A quorum being in attendance, if either house fail to effect an organization within the first four (4) days thereafter, the members of the house so failing shall be entitled to no compensation from the end of

10. Other provisions are not so unique and thus reliance on other jurisdictions' interpretations of similar constitutional provisions is entirely proper.

11. It should be noted also that the language of the Idaho Constitution differs substantially from the U.S. Constitution with regard to the grant or delegation of legislative power. Article I, § 1 of the U.S. Constitution grants "All legislative powers" to the U.S. Congress. Article III, § 1 of the Idaho Constitution delegates the legislative pow-

er to the State Legislature but, as I have noted, reserves co-equal power in the people to enact laws or reject those enacted by the Legislature. The U.S. Constitution provides for the people to petition for redress of grievances (amend.I), as does our State Constitution (art. I, § 10), but the U.S. Constitution does not provide for the people to "instruct their representatives" (art. I, § 10) or prohibit the legislative branch from legislating in secret session (art. III, § 12).

the said four (4) days until an organization shall have been effected.

(Emphasis added.) Thus, the majority holds, defining "business" as something other than a quorum of each house creates an inconsistency.[12]

It is asserted that because "business" appears in art. III, § 10, its definition there defines the business of the Legislature in art. III, § 12. However, when read in context, art. III, § 10 in no reasonable sense attempts to define "business" as that word is found in art. III, § 12. Note first the reference to "each house"—not "each house and the committee of the whole." Note also the reference to a smaller number than a quorum being able to *adjourn.* Adjourn from what? A meeting of the House or Senate, of course. In other words, "business" in art. III, § 10 denotes activity; "business" in art. III, § 12 denotes role or function. One should also note the fact that in art. III, § 12 the constitution drafters spoke of "the business", providing that "the business" shall be transacted openly and not in secret session. In art. III, § 10 the drafters required a quorum "to do business", not "the business". As used in art. III, § 12, business was used in a substantive sense. In art. III, § 10, it is used in a generic sense.

In many of our statutes referring to a quorum requirement, it is common to refer to a quorum being necessary for the doing or transacting of "business." *See* I.C. § 43–303 (majority of members of irrigation district "shall constitute a quorum to do business"); I.C. § 50–705 (majority of the full council of a municipal corporation "shall constitute a quorum for the transaction of business"); I.C. § 50–2006 (majority of members of urban renewal agency shall constitute quorum "for the purpose of conducting business"); I.C. § 54–5206 (majority of Idaho contractors board shall constitute a quorum "for the

transaction of business"); I.C. § 33–2805 (majority of board of trustees of University of Idaho Board of Regents necessary "for the transaction of business"). The list goes on. None of these requirements of quorums to do or transact business purport to define the business of the entity. In the context of private business, one would hardly expect a quorum provision in the articles of incorporation of a corporation to delineate the business that the corporation was authorized to transact. In other words, saying a majority of members shall constitute a quorum to do business is simply a way of phrasing the requirement that the house, when it is sitting as a house, have a majority of members to transact proceedings.

We can see that a quorum to do or transact business is the way such provisions were commonly phrased when our Constitution was drafted. Again, Mr. Cushing:

> In all councils, and other collective bodies of the same kind, it is necessary that a certain number, called a quorum, of the members, should meet and be present, *in order to the transaction of business.*
>
> . . .
>
> No business can regularly be entered upon until a quorum is present; nor can any business be regularly preceded with when it appears that the members present are reduced below that number . . .

Cushing at 20–21 (emphasis added). Mason's Manual employs the same phraseology: "A quorum of a deliberative body, whether a legislative body, an administrative board or a court, must be present in order to *transact business,* and to make its acts valid," and, "[t]he majority of the membership of a body constituted of a definite number of members constitutes a quorum for the purpose of *transacting business."* Mason's Manual § 500(1), (2) (emphasis added). And finally,

---

**12.** The majority also points out that "if the word 'business' included the work of all committees, then there would have been no reason to expressly include the committee of the whole within the provisions of Article III, § 12" and thus to read "business" as the Press Club asserts it should be read improperly renders reference to the committee of the whole "mere surplusage." However, as I have noted, the transcripts of the debates indicate that reference to the committee of the

whole simply went along, without much thought, with any reference to the Legislature. Without any debate about the committee of the whole as a separate entity, it seems the delegates just referenced the committee of the whole as a matter of course. On the other hand, the functions performed by the committee of the whole were and are similar to those performed by legislative committees.

the ordinary definition of "quorum": "[t]he minimum number of members ... who must be present for a body to *transact business or take a vote.*" BLACK'S LAW DICTIONARY 1263 (emphasis added).

Simply because the word "business" means one thing in one place does not mean it means the same thing in the next place. The meaning of a word depends on the context in which it is found. *Noscitur a sociis; State v. Hammersley,* 134 Idaho 816, 821, 10 P.3d 1285, 1290 (2000). The Legislature itself certainly understands the distinction, having statutorily declared:

> The people of the state of Idaho in creating the instruments of government that serve them, do not yield their sovereignty to the agencies so created. Therefore, the legislature finds and declares that it is the policy of this state that the formation of public policy is public *business* and shall not be conducted in secret.

I.C. § 67–2340 (emphasis added).[13] Thus, it is not at all inconsistent to say that "business" in art. III, § 10 means something different than in art. III, § 12. In context, it is perfectly sound.

### III.

The question in this case is really whether we derive the intent of art. III, § 12 from the meaning of its words and thus define the scope of the Legislature's business by examining the responsibility delegated to that body by the people of Idaho, or whether we ignore the substance and context of the words used and instead derive the drafters' intent by hastily applying a tool of construction and by defining the Legislature's business narrowly by another provision that requires a quorum of the House and Senate to do House and Senate business on the floor. Article I, § 10 provides that the people shall have the right to instruct their representatives and to petition the Legislature for the redress of grievances. If the people are allowed in on only the last act of the Legislature's business, they have not been given the full benefit of the authority they reserved in themselves.

The fact that the Legislature has chosen to establish committees and delegate a good deal of the legislative work to those committees should not deprive the people of the ability to have access to, and input in, meetings of committees where legislative business is being conducted. Bills are formulated in the committees, competing proposals are considered, amendments are made, public policy is formulated, and the people are entitled to participate. They have a limited ability to do so when the Legislature debates and votes in full session. If legislative committee work is shielded from public view, what is there to keep either house from conducting even more of its legislative work in committee, including perhaps the final debate, leaving only the final vote to occur in open session? This is not a wise road upon which to embark.

I would reverse the district court's ruling and hold that legislative committees, when meeting and considering matters related to legislation, are conducting "[t]he business of" the Legislature and are therefore subject to art. III, § 12. This is not to say, however, that all activities in which the Legislature engages are subject to art. III, § 12. Indeed, the Legislature's constitutional duty to make laws should be analyzed separately from the duties in which it engages that are not related to the legislative process. For instance, the Legislature does on occasion find itself engaged in matters related to litigation and may occasionally be informed of threats to the state. Members of the Legislature may be meeting with constituents, interest groups, or the like (*see* I.C. § 67–412), but these activities would not be considered "the business" of either house. These activities may attend a legislator's duty as a member of the house to which he or she belongs, but they are not related to the Legislature's constitutional duty of making laws. The committees do not enter the legislative pro-

---

**13.** ~~7~~ I find the Legislature's argument that it may under the Constitution close committee meetings a bit disingenuous, in light of I.C. § 67–2346: "All meetings of any standing, special, or select committee of either house of the legislature of the state of Idaho shall be open to the public at all times." I am puzzled why the Legislature would codify an openness requirement for its committees and then assert the right to disregard it.

cess until they are presented with a bill. In other words, committees enter the process when they are conducting legislative activity which the House or Senate has delegated to them.[14]

Justice BURDICK concurs.

---

14. The record does not reflect whether any of the closed meetings complained of by the Press Club were called for the consideration of legislation or, instead, for briefing on matters not related to the legislative process. The brief description provided by the Press Club indicates that some meetings were called to discuss the Snake River Water Rights Adjudication, one to discuss field burning and litigation surrounding it, and one to discuss the vulnerability of the state's water supplies to terrorist action. If these were merely briefings to advise the committees of ongoing litigation or a threat of terrorist activity and not for the purpose of considering the Legislature's business of law making, they might fall outside the ambit of art. III, § 12. However, there is not sufficient information regarding the substance of the meetings to know whether or not that would be the case.