# Constitutionality of the D.C. Voting Rights Act of 2007

S. 1257, a bill to grant the District of Columbia representation in the House of Representatives as well as to provide an additional House seat for Utah, violates the Constitution's provisions governing the composition and election of the United States Congress.

May 23, 2007

TESTIMONY BEFORE THE SUBCOMMITTEE ON THE
CONSTITUTION, CIVIL RIGHTS, AND PROPERTY RIGHTS
OF THE SENATE COMMITTEE ON THE JUDICIARY

Thank you for the opportunity to discuss the Department's views on S. 1257, a bill to grant the District of Columbia representation in the House of Representatives as well as to provide an additional House seat for Utah. For the same reasons stated in the Statement of Administration Policy on the House version of this legislation, the Administration concludes that S. 1257 violates the Constitution's provisions governing the composition and election of the United States Congress. Accordingly, if S. 1257 were presented to the President, his senior advisors would recommend that he veto the bill. I will confine my testimony to the constitutional issues posed by the legislation.

The Department's constitutional position on the legislation is straightforward and is dictated by the unambiguous text of the Constitution as understood and applied for over 200 years. Article I, Section 2 of the Constitution provides:

> The House of Representatives shall be composed of Members chosen every second Year by the People of *the several States*, and the Electors *in each State* shall have the Qualifications requisite for Electors of the most numerous branch of the *State Legislature*.

(Emphases added.)

This language, together with the language of eleven other explicit constitutional provisions, including the Twenty-Third Amendment ratified in 1961,[1] "makes clear just how deeply Congressional representation is tied to the structure of statehood."[2] The District of Columbia is not a state. In the absence of a constitutional amendment, therefore, the explicit provisions of the Constitution do not permit Congress to grant congressional representation to the District through legislation.

---

[1] *E.g.*, U.S. Const. art. I, §§ 2–4; art. II, § 1, cl. 2; amend. XIV, § 2; amend. XVII; amend. XXIII, § 1.

[2] *Adams v. Clinton*, 90 F. Supp. 2d 35, 47 (D.D.C.) (per curiam), *aff'd*, 531 U.S. 941 (2000).

Shortly after the Constitution was ratified, the District of Columbia was established as the seat of government of the United States in accordance with Article I, Section 8, Clause 17 of the Constitution. The Framers deliberately placed the capital in a federal enclave that was not itself a state to ensure that the federal government had the ability to protect itself from potentially hostile state forces. The Framers also gave Congress "exclusive" authority to enact legislation for the internal governance of the enclave to be chosen as the seat of government—the same authority Congress wields over the many other federal enclaves ceded by the states.

Beginning even before the District of Columbia was established as the seat of government, and continuing to today, there have been determined efforts to obtain congressional representation for the District. Apart from the various unsuccessful attempts to secure such representation through litigation, such efforts have consistently recognized that, because the District is not a state, a constitutional amendment is necessary for it to obtain congressional representation. S. 1257 represents a departure from that settled constitutional and historical understanding, which has long been recognized and accepted by even ardent proponents of District representation.

One of the earliest attempts to secure congressional representation for the seat of government was made by no less a constitutional authority than Alexander Hamilton at the pivotal New York ratifying convention. Recognizing that the proposed Constitution did not provide congressional representation for those who would reside in the seat of government, Hamilton offered an amendment to the Enclave Clause that would have provided:

> That When the Number of Persons in the District of Territory to be laid out for the Seat of the Government of the United States, shall according to the Rule for the Apportionment of Representatives and Direct Taxes Amount to [left blank] such District shall cease to be parcel of the State granting the Same, *and Provision shall be made by Congress for their having a District Representation in that Body*.[3]

Hamilton's proposed amendment was rejected. Other historical materials further confirm the contemporary understanding that the Constitution did not contemplate congressional representation for the District and that a constitutional amendment would be necessary to make such provision.[4] These historical facts refute the

---

[3] 5 *The Papers of Alexander Hamilton* 189–90 (Harold C. Syrett ed., 1962) (emphasis added).

[4] *See* 10 Annals of Cong. 991, 998–99 (1801) (remarks of Rep. John Dennis of Maryland) (stating that because of District residents' "contiguity to, and residence among the members of [Congress]," that "though they might not be represented in the national body, their voice would be heard. But if it should be necessary [that they be represented], the Constitution might be so altered as to give them a delegate to the General Legislature when their numbers should become sufficient"); *see also* 5 *The*

contention by proponents of S. 1257 that the Framers simply did not consider the lack of congressional representation and, if they had considered it, that they would have provided such representation. In fact, Framers and ratifiers did consider the question and rejected a proposal for such representation.

In more recent years, major efforts to provide congressional representation for the District were pursued in Congress in the 1960s and 1970s, but on each occasion Congress expressly recognized that obtaining such representation would require either statehood or a constitutional amendment. For example, when the House Judiciary Committee favorably recommended a constitutional amendment for District representation in 1967, it stated as follows:

> *If the citizens of the District are to have voting representation in the Congress, a constitutional amendment is essential; statutory action alone will not suffice.* This is the case because provisions for elections of Senators and Representatives in the Constitution are stated in terms of the States, and the District of Columbia is not a State.[5]

Congress again considered the District representation issue in 1975, and the House Judiciary Committee again expressly acknowledged that, "[i]f the citizens of the District are to have voting representation in Congress, a constitutional amendment is essential; statutory action will not suffice."[6]

Of course, the courts have not directly reviewed the constitutionality of a statute purporting to grant the District representation because, for the reasons so forcefully reiterated by the House Judiciary Committee, Congress has not previously considered such legislation constitutionally permissible. But numerous federal courts *have* emphatically concluded that the existing Constitution does not permit the provision of congressional representation for the District. In *Adams v. Clinton*, a three-judge court stated, in a decision affirmed by the Supreme Court, that "the Constitution does not contemplate that the District may serve as a state for purposes of the apportionment of congressional representatives" and stressed that Article I "makes clear just how deeply Congressional representation is tied to the structure of statehood." 90 F. Supp. 2d 35, 46–47, 50 (D.D.C.) (per curiam), *aff'd*, 531 U.S. 941 (2000*); see generally S. Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 462 (1979) (stating that summary affirmance is a preceden-

---

*Documentary History of the Ratification of the Constitution* 621 (John P. Kaminski & Gaspare J. Saladino eds., 1998) (statement by Samuel Osgood, a delegate to the Massachusetts ratifying convention, that he could accept the seat of government provision only if it were amended to provide that the District be "represented in the lower House," though no such amendment was ultimately included in the amendments recommended by the Massachusetts convention).

[5] *Providing Representation of the District of Columbia in Congress*, H.R. Rep. No. 90-819, at 4 (1967) (emphasis added).

[6] *Providing Representation of the District of Columbia in Congress*, H.R. Rep. No. 94-714, at 4 (1975).

tial ruling on the merits). In *Banner v. United States*, a panel of the D.C. Circuit that included Chief Justice John Roberts flatly concluded: "The Constitution denies District residents voting representation in Congress. . . . Congress is the District's Government, *see* U.S. Const. art. I, § 8, cl. 17, and the fact that District residents do not have congressional representation does not alter that constitutional reality." 428 F.3d 303, 309 (D.C. Cir. 2005) (per curiam).[7] The court added: "It is beyond question that the Constitution grants Congress exclusive authority to govern the District, but does not provide for District representation in Congress." *Id*. at 312. And in explaining why the Constitution does not permit the District's delegate in Congress to have the voting power of a representative in *Michel v. Anderson*, 817 F. Supp. 126 (D.D.C. 1993), the court stressed that the legislative power "is constitutionally limited to 'Members chosen . . . by the People of the several States.' U.S. Const. art. I, § [2], cl. 1." *Id*. at 140.

The numerous explicit provisions of the constitutional text; the consistent construction of those provisions throughout the course of American history by courts, Congress, and the Executive;[8] and the historical evidence of the Framers' and ratifiers' intent in adopting the Constitution conclusively demonstrate that the Constitution does not permit the granting of congressional representation to the District by simple legislation.

We are aware of, and not persuaded by, the recent and novel claim that this legislation should be viewed as a constitutional exercise of Congress's authority under the Enclave Clause, U.S. Const. art. I, § 8, cl. 17, to "exercise exclusive legislation" over the seat of government and other federal enclaves. That theory is insupportable. First, it is incompatible with the plain language of the many provisions of the Constitution that, unlike the Enclave Clause, are directly and specifically concerned with the composition, election, and very nature of the House of Representatives and the Congress. Those provisions were the very linchpin of the Constitution, because it was only by reconciling the conflicting wishes of the large and small states as to representation in Congress that the Great Compromise that enabled the Constitution's ratification was made possible.

---

[7] Judge Roberts was a member of the D.C. Circuit when *Banner* was briefed and argued, but was serving as Chief Justice when the opinion issued. *See Banner*, 428 F.3d at 304–05 n.1.

[8] *See, e.g.*, Letter for Mr. Benjamin Zelenko, Committee on the Judiciary, House of Representatives, from Martin F. Richman, Acting Assistant Attorney General, Office of Legal Counsel (Aug. 11, 1967) (expressing the view that "a constitutional amendment is essential" for the District to obtain voting representation in Congress in the recommendations for the Committee Report on a proposed constitutional amendment); *District of Columbia Representation in Congress*: *Hearings on S.J. Res. 65 Before the Subcomm. on the Constitution of the Comm. on the Judiciary*, 95th Cong. 16–29 (1978) (statement of John M. Harmon, Assistant Attorney General, Office of Legal Counsel). In endorsing a constitutional amendment as the means of obtaining congressional representation for the District, Mr. Harmon discussed the alternative ways of obtaining such representation, particularly the option of statehood legislation. Conspicuous by its absence was any suggestion that such representation could be provided through legislation granting the District a seat.

Consequently, every word of Article I's provisions concerning the composition and election of the House and the Senate—and particularly the words repeatedly linking congressional representation to "each State" or "the People of the several States"—was carefully chosen. In contrast, the Enclave Clause has nothing to do with the composition, qualifications, or election of members of Congress. Its provision for "exclusive legislation" concerns legislation respecting the *internal operation of* "such District" and other enclaves. The Enclave Clause gives Congress extensive legislative authority "over such District," but that authority plainly does not extend to legislation affecting the entire nation. S. 1257 would alter the very nature of the House of Representatives. By no reasonable construction can the narrowly focused provisions of the Enclave Clause be construed to give Congress such sweeping authority.

Second, whatever power Congress has under the Enclave Clause is limited by the other provisions of the Constitution. As stated by the Supreme Court in *Binns v. United States*, 194 U.S. 486 (1904), the Enclave Clause gives Congress plenary power over the District "save as controlled by the provisions of the Constitution." *Id*. at 491. As the Supreme Court has further explained, the Clause gives Congress legislative authority over the District and other enclaves "in all cases where legislation is possible."[9] The composition, election, and qualifications of members of the House are expressly and specifically governed by other provisions of the Constitution that tie congressional representation to statehood. The Enclave Clause gives Congress no authority to deviate from those core constitutional provisions.

Third, the notion that the Enclave Clause authorized legislation establishing congressional representation for the seat of government is contrary to the contemporary understanding of the Framers and the consistent historical practice of Congress. As I mentioned earlier, the amendment unsuccessfully offered by Alexander Hamilton at the New York ratifying convention to authorize such representation when the seat of government's population reached a certain level persuasively demonstrates that the Framers did not read the Enclave Clause to authorize or contemplate such representation. Other contemporaneous historical evidence reinforces that understanding. *See supra* note 4. Moreover, Congress's consistent recognition in practice that constitutional amendments were necessary not only to provide congressional representation for the District, but also to grant it electoral votes for President and Vice President under the Twenty-Third Amendment, belies the notion that the Enclave Clause has all along authorized the achievement of such measures through simple legislation. Given the enthusiastic support for such measures by their congressional proponents, it is simply implausible that Congress would not previously have discovered and utilized that authority as a means of avoiding the enormous difficulties of constitutional amendment.

---

[9] *O'Donoghue v. United States*, 289 U.S. 516, 539 (1993) (citation omitted).

Fourth, the proponents' interpretation of the Enclave Clause proves far too much; the consequences that would necessarily flow from acceptance of that theory demonstrate its implausibility. As the Supreme Court has recognized, "[t]he power of Congress over federal enclaves that come within the scope of Art. I, § 8, cl. 17, is obviously the same as the power of Congress over the District of Columbia."[10] It follows that if Congress has constitutional authority to provide congressional representation for the District under the Enclave Clause, it has the same authority for the other numerous federal enclaves (such as various military bases and assorted federal lands ceded by the states). But that is not all. The Supreme Court has also recognized that Congress's authority to legislate respecting the U.S. territories under the Territories Clause, U.S. Const. art. IV, § 3, cl. 2, is equivalent to its "exclusive legislation" authority under the Enclave Clause. *See, e.g.*, *Binns*, 194 U.S. at 488. If the general language of the Enclave Clause provides authority to depart from the congressional representational provisions of Article I, it is not apparent why similar authority does not reside in the Territories Clause, which would enable Congress to enact legislation authorizing congressional representation for Puerto Rico, the Virgin Islands, and other territories. These unavoidable corollaries of the theory underlying S. 1257 demonstrate its invalidity. Given the great care with which the Framers provided for state-based congressional representation in the Composition Clause and related provisions, it is implausible to suggest that they would have simultaneously provided for the subversion of those very provisions by giving Congress *carte blanche* to create an indefinite number of additional seats under the Enclave Clause.

Finally, we note that the bill's proponents conspicuously fail to address another logical consequence that flows from the Enclave Clause theory: If Congress may grant the District representation in the House by virtue of its purportedly expansive authority to legislate to further the District's general welfare, it follows logically that it could use the same authority to grant the District (and other enclaves and territories) two Senators as well.

At bottom, the theory that underlies S. 1257 rests on the premise that the Framers drafted a Constitution that left the door open for the creation of an indefinite number of congressional seats that would have fatally undermined the carefully crafted representation provisions that were the linchpin of the Constitution. Such a premise is contradicted by the historical and constitutional record.

The clear and carefully phrased provisions for state-based congressional representation constitute the very bedrock of our Constitution. Those provisions have stood the test of time in providing a strong and stable basis for the preservation of constitutional democracy and the rule of law. If enacted, S. 1257 would undermine the integrity of those critical provisions and open the door to further deviations

---

[10] *Paul v. United States*, 371 U.S. 245, 263–64 (1963).

from the successful framework that is our constitutional heritage. If the District is to be accorded congressional representation without statehood, it must be accomplished through a process that is consistent with our constitutional scheme, such as amendment as provided by Article V of the Constitution.

> JOHN P. ELWOOD
> *Deputy Assistant Attorney General*
> *Office of Legal Counsel*